HAWKINS *v.* SCANLON.

4-8302                                    206 S. W. 2d 179

Opinion delivered November 3, 1947.

Rehearing denied December 15, 1947.

*John G. Moore* and *Charles L. Farish*, for appellant.

*J. E. Brazil* and *Hays, Wait & Williams*, for appellee.

ED F. McFADDIN, Justice. This is a suit between members of a family to determine ownership of property.

John Scanlon, Sr. departed this life intestate in 1908, the owner of the realty here involved, being lots 4, 5 and 6, block 9, Moose Addition to Morrilton. He was survived by his wife, Mary Scanlon, and three sons and one daughter. The sons are the appellees, Jim, John and George Scanlon. The daughter, Margaret Scanlon Blair, was mother of the appellant Catherine Hawkins. The widow Scanlon and the three sons continued to live on the property after 1908. In 1912, Margaret Scanlon Blair, the daughter, became a widow, and returned to the property with her baby daughter, then two years of age (present appellant). In 1913, Mary Scanlon died, and the three Scanlon brothers and the sister, together with her daughter, continued to live on the property. There were several houses on the lots, and Mrs. Blair was in charge of them for herself and her three brothers.

In 1929, all the buildings, except one, were destroyed by fire; and the insurance money of $8,000 was used to finance the building of an apartment house on lot 4. To complete the financing of this building, the four heirs executed a mortgage on lot 4 to the Jefferson Standard Life Insurance Company for a loan of $3,500. George and Jim Scanlon worked on the building, and furnished the plumbing fixtures and many other items. When the apartment building was finished, the three brothers and the sister and her child occupied one apartment, and rented the other four apartments to tenants. Mrs. Blair continued to have charge of the apartment property, and also the other house reconstructed on lots 5 and 6.

In 1931, the economic depression adversely affected the fortunes of these people. The three Scanlon men left Morrilton in search of employment; and Mrs. Blair had difficulty in obtaining sufficient rental returns to pay taxes and keep the loan current. She made her living as a seamstress. By 1933, her daughter Catherine had completed her education, and had begun to work; and her small salary helped to provide sustenance. Later

(in 1942) Catherine Blair married, and she and her husband (Mr. Hawkins) lived with Mrs. Blair, and assisted in providing for her in her illness.

In 1931, Mrs. Blair and George Scanlon mortgaged lots 5 and 6 for $1,242.72 to T. P. Austin. The use to which this money was put is not definitely shown. In 1932, George Scanlon executed a deed to Margaret Blair for all of his interest in lots 4, 5 and 6 for the recited consideration of $1,250. In 1933, Jim Scanlon deeded his interest in the lots to Margaret Blair for the recited consideration of $2,000. The description in this deed was later found to be erroneous, so in 1936 he cured all defects by executing a quitclaim deed to Margaret Blair. The effect of these three deeds will be discussed in topic heading I hereinafter.

In 1936, Margaret Blair and John Scanlon obtained a loan from the Morrilton Federal Savings & Loan Association for $2,000, and used the money to retire the Jefferson Standard loan. Later, Mrs. Blair and John Scanlon obtained an additional loan from the same association for money to apply on taxes, interest, etc. The mortgages to the Morrilton Federal Savings & Loan Association are still unsatisfied, and constitute a first lien on the property.

Then, in 1939, Mrs. Blair's health failed. She was an invalid until her death in 1943. During this illness the three brothers continued to visit her and send her money just as they had done at all times since 1931. Be it said to the eternal credit of the three Scanlon men that they were true and loyal brothers to their sister. The record is replete with instances of their continued sending of money to Mrs. Blair. She was just as devoted a sister as they were brothers. It was a fine family relationship; and it is lamentable that it must end in this litigation. After Mrs. Blair's death in 1943, Catherine Hawkins and her husband continued to live in the apartment building, and she collected the rents and tried to look after the property as her mother had formerly done.

The property had been sold for delinquent improvement district taxes; and in 1942 Jim Scanlon paid $1,000 to dispose of the claim of the tax purchaser. The redemption deed was taken in the name of Catherine Hawkins, but the fact that Jim Scanlon paid the money is admitted by all parties. This will be discussed in topic heading III. At a date not shown, Catherine Blair claims to have paid $1,600 to settle the Austin mortgage that had been executed in 1931. Then comes this litigation.

In 1945, Catherine Hawkins, claiming to be the owner of an undivided three-fourths interest in the property, filed the present suit for partition. She alleged that John Scanlon was the owner of the remaining one-fourth interest. She further alleged that the property could not be divided in kind, and should be sold subject to the two mortgages to the Morrilton Federal Savings & Loan Association.

Appellees, Jim and George Scanlon, intervened, and John Scanlon made common cause with them; and they claimed that Catherine Hawkins owned only an undivided one-fourth interest in the realty and the furnishings in the apartment house, and that the three Scanlon brothers each owned an undivided one-fourth interest. Interwoven with the question of the ownership of the realty and the aforementioned furnishings, there were questions of advances and accounting.

The chancery court found and decreed: (1) that the appellant and the three appellees were tenants in common of the realty, each owning an undivided one-fourth interest subject to the Morrilton Savings & Loan Association mortgages; (2) that the furnishings in the apartment building (with the exception of clothing and a piano) were owned by Catherine Hawkins individually; and (3) that the appellees were not entitled to an accounting from Catherine Hawkins for the rents she had collected from the property. From the decree all parties have appealed: Catherine Hawkins on direct appeal, and appellees on cross appeal. We will discuss and decide the various contentions in the topic headings hereinafter set forth.

I. *Ownership of the Realty.* Catherine Hawkins' claim for three-fourths interest in the realty was based on the fact that she was sole heir of her mother who owned one-fourth interest by inheritance, and who had acquired by deeds the one-fourth interest of George Scanlon in 1932 and the one-fourth interest of Jim Scanlon in 1933 and 1936, to which said deeds we have previously referred. To overcome this record ownership and the effect of the deeds made to Margaret Blair, the said Jim and George Scanlon, supported by John Scanlon, testified that Margaret Blair never paid them anything for the deeds, and that the real consideration was their trust and confidence in Margaret Blair. John Scanlon testified that Jim and George executed the deeds to Margaret, so that she could use their record interest to obtain additional money to finance the property for the benefit of all of them. His testimony on this point is:

"Q. Do you know whether or not the conveyance of George's interest was an outright sale?

"A. No, sir; it was not.

"Q. Do you know whether or not Jim's conveyance of his interest was an outright sale?

"A. No, sir; it was not.

"Q. Did your brothers and your sister agree upon that method of dealing with the property while they were absent from it?

"A. Yes, sir.

"Q. Were financial conditions such at that time that you did have to refinance the original debt against the property?

"A. Yes, sir.

"Q. Was Jim to give his sister a deed to his undivided interest for the same purpose that George gave her a deed to his?

"A. Yes, sir.

"Q. Was your sister Margaret to hold their undivided interests in trust until the debts were paid?

"A.  Yes, sir.

"Q.  Did she ever pay either of your brothers anything for their interest in the land?

"A.  No, sir."

George Scanlon testified that he deeded his interest to his sister to "hold it in trust." Jim Scanlon testified to like effect.

But when we give full effect to appellees' testimony, we find them seeking to engraft by parol testimony an express trust on the deeds that they had made to Mrs. Blair; and this is forbidden by our statute. Section 6064, Pope's Digest, reads:

"All declarations or creations of trusts or confidences of any lands or tenements shall be manifested and proven by some writing signed by the party who is or shall be by law enabled to declare such trusts, or by his last will in writing, or else they shall be void; and all grants and assignments of any trusts or confidences shall be in writing, signed by the party granting or assigning the same, or by his last will in writing, or else they shall be void."

This section comes to us from Chapter 65, § 10 of the Revised Statutes of 1838, and was adopted into our statute law from § 7 of the English statute of 29 Chas. II, Chapter 3.* This section, 6064, Pope's Digest, has many times been before this court. Some of our cases are: *McDonald* v. *Hooker,* 57 Ark. 632, 22 S. W. 655, 23 S. W. 678; *Harbour* v. *Harbour,* 103 Ark. 273, 146 S. W. 867; *Veasey* v. *Veasey,* 110 Ark. 389, 162 S. W. 45; *Queen* v. *Queen,* 116 Ark. 370, 172 S. W. 1018, Ann. Cas. 1917A 1101; *Jeffery* v. *Patton,* 182 Ark. 449, 31 S. W. 2d 738. Many other cases on the same statute are collected in West's Arkansas Digest, "Trusts," § 43.

The facts in the case at bar bring it within the interdiction of this statute. The appellees claim that Jim and

---

* This statute was discussed in some detail in *Reiter* v. *Carroll,* 210 Ark. 841, 198 S. W. 2d 163, in regard to the revocation of wills. The historical setting and discussion apply with equal force to the prohibition of parol testimony to establish an express trust on a written instrument.

George Scanlon deeded the property to Margaret Blair on her agreement to hold the property in trust for them. But she gave no instrument in writing to this effect; and only an instrument in writing is competent evidence under this statute insofar as realty is concerned. The deeds were placed of record in 1936; appellees knew in 1939 that their sister had an incurable malady, but they required no conveyance or instrument in writing. She died in 1943. They cannot now be heard in their effort to prove an express trust by parol evidence. They made a clear case of an express trust. The case of *Armstrong* v. *Armstrong*, 181 Ark. 597, 27 S. W. 2d 88 is limited to its own peculiar facts of fraud and imposition, and does not apply here because such facts are not here present. In *Spradling* v. *Spradling*, 101 Ark. 451, 142 S. W. 848, Mr. Justice FRAUENTHAL stated the rule here applicable as follows: "When a trust arises from an agreement between the parties or from the declaration of the beneficial owner of the property, made to establish a trust, it is within the statute of frauds, and must be proved by writing, in the absence of fraud or imposition. Kirby's Digest, § 3666; *Robinson* v. *Robinson*, 45 Ark. 481; *Bland* v. *Talley*, 50 Ark. 71, 6 S. W. 234; *Salyers* v. *Smith*, 67 Ark. 526, 55 S. W. 936; *Grayson* v. *Bowlin*, 70 Ark. 145, 66 S. W. 658." The arguments made by the appellees in the case at bar are similar to those unsuccessfully made by appellees in *Mitchell* v. *Powell*, 194 Ark. 638, 109 S. W. 2d 155.

Without dwelling on the point further, we conclude that Catherine Blair is the owner of three-fourths of the realty, and John Scanlon is the owner of one-fourth of the realty; and to this extent the decree of the lower court is reversed on the direct appeal, and the cause remanded for a decree in accordance with this opinion.

II. *Ownership of the Personalty.* The chancery court allowed each party to remove his clothing from the building, and awarded George Scanlon the piano. We affirm the aforementioned portion of the decree. Furthermore, appellees concede that the furnishings in Mrs. Blair's apartment belong to Catherine Hawkins. What we are now about to say does not relate to the clothing,

the piano, and the furnishings in the apartment occupied by Mrs. Blair. The chancellor in the third finding in the opinion said:

"The personal property consisting of all furniture and fixtures, except that designated as realty, the court holds belongs to the plaintiff."

As to the decree based on this finding, appellees have cross-appealed; and we reverse the chancery court on this point.

When the building was first completed, Mrs. Blair rented the four apartments unfurnished, but thereafter she furnished the apartments for rental. Catherine Hawkins testified as to this:

"Q. Mrs. Hawkins, you recall when the apartment house was first constructed? A. Yes. Q. Were the apartments rented furnished or unfurnished? A. They were unfurnished. Q. How long were they rented unfurnished? A. Two or three years. Q. Who furnished the apartments for rental?. A. Mother did. Q. Where did she get the money for furniture? A. She bought it with the income of the house."

When we recall that the apartment building was constructed in 1929, and that Jim Scanlon did not execute his deed until July, 1932, and that John Scanlon did not execute his first deed until January, 1933, it is clear that the apartments were furnished with the rent money obtained before Jim and George Scanlon parted with their title; and therefore their part of the rent money, along with the part of John Scanlon and Margaret Blair, had already been used to buy the furnishings. Furthermore, the record reflects that up until May 3, 1932, Jim Scanlon had sent Margaret Blair a total of $1,210, and that George Scanlon collected $750 in insurance, part of which was used to buy furniture for the apartment building. In the light of all this evidence, it is apparent that the appellees each owned an undivided one-fourth interest in all the personal property in the four rented apartments in the building, before the three Scanlon deeds. John Scanlon would still own his fourth, since he all the time was le-

gally entitled to one-fourth of the rents, and Catherine Hawkins testified that the apartments were furnished with the rent money.

The deeds executed by Jim and George Scanlon did not attempt to convey their interest in the personal property. Furthermore, the interdiction of § 6064, Pope's Digest, applies only to realty, and not to personalty. So, even if Jim and George Scalon transferred to Mrs. Blair their interest in the personal property, they could still establish the trust by parol evidence. An express trust may be shown by parol evidence as regards personalty. *Scott* v. *Miller,* 179 Ark. 7, 13 S. W. 2d 819; *Oliver* v. *Oliver,* 182 Ark. 1025, 34 S. W. 2d 226; and *Hand* v. *Mitchell,* 209 Ark. 996, 193 S. W. 2d 333; and see generally 54 Am. Juris. 55. The testimony in the case at bar meets the test prescribed in our cases as above cited; and we therefore hold that the personal property in the four rented apartments is owned one-fourth by the appellant and one-fourth by each of the appellees.

III. *Jim Scanlon's Right to Subrogation.* The property became delinquent for improvement taxes, and was purchased by a third party; and in 1942 Jim Scanlon paid the holder of the tax title the sum of $1,000 for a deed to the property. Catherine Hawkins handled the transaction for Jim Scanlon, and took the deed in her name. He was not a volunteer, because he paid the money at the request of Catherine Hawkins; so he is entitled to relief under the principle of equitable subrogation. *Stephenson* v. *Grant,* 168 Ark. 927, 271 S. W. 974; *Robertson* v. *Lewis,* 195 Ark. 989, 115 S. W. 2d 264. We therefore hold that from the proceeds of the sale of the realty Jim Scanlon is entitled to recover $1,000 with interest at 6% from April 25, 1942, until repaid.

IV. *Catherine Hawkins' Claim for Priority.* Catherine Hawkins claims she is entitled to a prior claim for $1,600, because she testified that this was the amount she paid for the Austin note and mortgage. Under this present opinion she receives three-fourths of the realty, so it is proper that she should pay three-fourths of the

Austin note; and the only contention remaining about the Austin indebtedness is whether Catherine Hawkins should recover from John Scanlon one-fourth of the amount she claims to have paid Austin.

On that issue, we point out that Catherine Hawkins did not testify as to when she paid the Austin note. She did say that her mother left no debts, "except a few small ones," so it may be inferred that the Austin note was paid during the lifetime of Mrs. Blair. Catherine Hawkins did not testify whether she paid the Austin note from her own funds, or from money received by her from the Scanlons. So, we hold that the evidence is insufficient to show that she paid the Austin note with her own money; and we therefore deny her claim for reimbursement.

V. *Accounting.* Since Jim and George Scanlon have no interest in the realty, their claim for an accounting for rents necessarily passes out of the case. John Scanlon is, of course, entitled to an accounting, and his right was recognized by Catherine Hawkins when she filed a detailed and verified statement of all receipts and disbursements, and stated that $144.38 was the amount belonging to John Scanlon. On remand the chancery court will enter a decree in favor of John Scanlon for said $144.38, and also for any other net amounts that may have accrued to him after the accounting period covered in the said statement.

*Conclusion:* The decree of the chancery court is reversed, and the cause is remanded, for the decree heretofore entered to be changed only to the extent indicated in this opinion. Costs of this appeal, as well as all other costs, will be adjudged to be paid from the proceeds of the sale of the realty.