JAMES D. WHITE ET UX *v.* JOHN JUNIOR WHITE
EX UX

5-6109                                    493 S.W. 2d 133

Opinion delivered April 16, 1973

*Hartje & Hartje,* for appellants.

*No brief for appellees.*

JOHN A. FOGLEMAN, Justice. Appellants assert that the chancery court erred in denying them any interest in certain real estate that had been used in the operation of a farming partnership known as White Brothers Enterprises, in which appellant James D. White and appellee John Junior White were the partners, in refusing to set aside a deed from James D. White to John Junior White executed in 1954, and in denying James D. White compensation for his services in conducting the business of the partnership when his brother refused to participate further. This litigation was commenced by the filing by James D. White and his wife Shirley of a petition to dissolve the partnership. (Since the

members of the family and some other witnesses refer to James D. as Daniel and to John Junior as Junior, we will hereafter do so.) Daniel complained that Junior was not devoting his full time to the affairs of the partnership, as required by the partnership agreement and that it had become impossible for Daniel to continue the operation. Junior and his wife, M. June White, were named as defendants. Daniel also alleged that it was agreed that he would acquire a one-half interest in all real estate theretofore owned by Junior and his wife that was used in the partnership business at a price of $23,872.16 for one-half of the personal property and $40,800 for the real estate. Daniel also sought to recover $5,000 he alleged that he had loaned Junior. Appellants prayed that the partnership be dissolved, and that the property of the partnership be sold free and clear of the dower and homestead rights of the parties.

M. June White filed an answer denying that she was a party to any partnership agreement, or that she had ever waived any interest in the lands of her husband or agreed to execute a deed to Daniel White. She alleged that the lands involved were owned by her and her husband as an estate by the entirety. She pleaded the statute of frauds as a defense.

Junior White filed an answer and counterclaim. He admitted the existence of the partnership, saying that it was to own real estate and engage in a general farming business, to which both partners were to devote their full time. He admitted an oral agreement to sell Daniel a one-half interest in the lands described in the complaint (except for two tracts) and a one-half interest in all livestock, farm equipment and inventory for a total consideration of $64,672.16, but alleged that no part of the interest in the real estate was to be conveyed until the purchase price was paid in full while the partnership was still in operation and undissolved. He asserted that he and his wife were to pay all indebtedness secured by liens in favor of the Federal Land Bank of St. Louis and Farmers Home Administration, and that four tracts were bought and paid for with partnership funds and owned jointly by the parties. Junior

alleged that the partnership operated the property during 1967, 1968 and 1969 and that, after crediting payments made by James, there remained a balance of $57,972.78 due upon the purchase price for the land and personal property, on which no payments had been made since December 1968, and that Daniel was only entitled to credit in the partnership dissolution for the payments made. Junior blamed the failure of the partnership upon his brother Daniel and, joining in the prayer for dissolution of the partnership, asked that Daniel make an accounting for his operation of the partnership after Junior had ceased to participate and had obtained other employment. He also denied owing Daniel $5,000. Junior pleaded the statute of frauds. He admitted having received partnership funds amounting to $1,121.80 for oil and gas rentals and ASC payments. In his counterclaim, he sought $30,000 damages for James' alleged refusal to cooperate in the management of the partnership.

Daniel amended his petition to allege that the two tracts (Tracts 5 and 8) which Junior alleged were not included in the oral agreement for sale, had been deeded to the two brothers by their father in 1951 and that they had agreed that tract 5 would be the property of Daniel and tract 8 would belong to Junior. Daniel admitted that he had executed a quitclaim deed to Junior for the tracts, but alleged that the deed was without consideration and void, and had been recognized as invalid by the brothers who had acquiesced in their agreed division in spite of this deed. Junior admitted the deed from the father, but alleged that the quitclaim deed was executed in 1954, and denied all other allegations of this amendment.

In response to the answer of June White, appellants pleaded estoppel, alleging that she had taken part in the partnership operations, attended all partnership meetings, had consented and agreed to the sale of the real estate and by her actions had led appellants into undertaking the venture and making payments toward the purchase of the real estate.

It was admitted that the two brothers and their wives had signed notes and mortgages to Central Arkansas Production Credit Association to secure indebtedness for the use and benefit of White Brothers Enterprises. The personal property was sold at auction during the course of the proceedings. It brought net proceeds of $51,023.08, out of which such an indebtedness of $20,508.27 to First Security Bank at Searcy was retired.

The chancellor made comprehensive findings which included the following:

John Junior White was the owner of all of the lands and personal property to be used by the partnership. The lands and real estate were then subject to mortgages and liens to secure debts of John Junior White, and he has personally made the payments thereon for 1967 and each calendar year thereafter.

The partners agreed that James D. White might purchase a one-half interest in all of the property at agreed values as follows:

| | |
|---|---|
| Lands (one-half interest) | $40,800.00 |
| Personal Property (one-half interest) | 23,872.16 |

That no due dates were set for payment of said purchase price, but that it would bear interest at the rate of 6% per annum.

The partners operated the partnership during 1967 to 1969, when the profits of the partnership began to materially decrease, and in 1970 it operated at a loss.

The partners had disagreements as to operating policies, division of labor and management. In January of 1969, defendant, John Junior White, delivered the books of the partnership to plaintiff, James D. White, who kept the same thereafter.

The partners, during 1967, 1968, and 1969, paid equal amounts weekly to their wives, as household operating expenses, and in addition, from time to

time, and each time by agreement, drew equal amounts of money from the business.

At various times during the years 1967, 1968, 1969 and January 1970, plaintiff, James D. White, made payments to defendant, John Junior White, in varying amounts to be applied upon the purchase price of the one-half interest in the partnership property, the total of such payments being $19,-975.00.

In the operation of the business substantially all of the original equipment, supplies and livestock and other personal property contributed by John Junior White were sold and converted into other equipment, supplies and different types of livestock.

The partnership purchased out of the partnership funds the following real estate: * * * (Tracts 14, 15, 16 and 17.)

In January 1970, the plaintiff, James D. White, refused to agree to further withdrawals by the partners and John Junior White thereupon withdrew from further operation of the partnership. Thereafter he contributed no further labor or effort to the operation.

* * *

During the year 1970, the plaintiff, James D. White withdrew and paid himself, as salary, from partnership funds $5,040.00, and during 1971,· $2,240.00. During such time he operated the properties. There was no agreement between the parties as to the withdrawals.

The plaintiff, James D. White, conveyed to the defendant, John J. White, in the year 1954, the lands designated as: * * * (Tracts 5 and 8) and the plaintiff no longer has any right, title or interest therein.

The defendant, John J. White is indebted to the plaintiff, James D. White, in the sum of $5,000.00 evidenced by the Note dated February 3, 1966, with interest at the rate of 10% per annum from the 3rd day of February 1966.

\* \* \*

The defendants, John J. White and June White, are entitled to a return of all lands and real estate contributed by them at the beginning of the partnership, free and clear of all right, title, or interest of the plaintiffs, James D. White and Shirley White.

The plaintiff, James D. White should be credited upon the purchase of the one-half interest in the personal property which was $23,872.16, with interest at 6%, the sum of $19,975.00 paid by him, leaving a balance due of $6,957.21, as of the date hereof due to John J. White.

The defendant, John Junior White, shall be entitled to withdraw from the funds in the registry of the Court an amount equal to those withdrawn by plaintiff, James D. White, as salary, being $7,280.00.

The court directed the sale of Tracts 14, 15, 16 and 17 by its commissioner named in the decree, the payment into the registry of the court of any partnership funds collected by the partners individually, and the distribution of funds in the registry of the court to the payment of the court costs and then:

$7,280.00 shall be paid to John J. White, as provided in Paragraph 19, plus his one-half of the remaining funds in the registry of the Court.

Out of James D. White's one-half share of the balance of funds the sum of $5,957.21, representing the balance owed by him as per Paragraph 18 above, shall be paid to John J. White, and the remainder paid to the said James D. White.

Daniel was given judgment for the $5,000 note and interest to be paid out of funds distributable to Junior.

Appellants first assert that the chancery court erred in refusing to set aside the 1954 deed and requiring a reconveyance to Daniel of tract No. 5. Tracts 5 and 8 had been deeded to the two sons as tenants in common by their father in 1951.[1] Daniel asserted that there was an agreement between the two sons that tract 5 would be his property and tract 8 the property of Junior. Daniel conveyed all his interest in the two tracts to Junior on December 30, 1954, when Daniel was 19 or 20 years old. Daniel described this conveyance as a "loan" of the land to Junior, made for the sole purpose of enabling Junior to use it as collateral to obtain finacing for a cattle operation. Daniel testified that Junior was obligated to reconvey the tract whenever Daniel requested, and that Junior had paid rent on tract 5 ever since the quitclaim deed was executed. Daniel said that this tract was a part of his contribution to the partnership. For corroboration appellants rely, in part, upon the assertion that Junior recognized that Daniel was the owner of the tract 11 years after the date of the deed by sending him a check for $169 marked "rent on 44 acres" with a covering letter giving this explanation:

> "$25.00 Earnest payed
>   44.00 Oil Lease
>  100.00 my rent
>  169.00"

Appellants also point out that Ernest Turner testified that when he went to Junior to rent this tract he was referred to and entered into the rental agreement with Daniel but paid the rent to Junior because Daniel had then gone to California.

This check was returned to Junior by Daniel in a letter in which Daniel said that he did not want anything for the use of the land, that the "oil lease money"

---

[1] The deed conveyed a total of 169 acres, but all parties agree that Junior purchased 100 acres of this and that the father gave tracts 5 and 8 to the two brothers.

could be used to pay taxes and that the rent paid by Turner could be applied toward getting house plans, after which Daniel would pay the balance of their cost.

There are copies of applications for loans made in 1968 to Central Arkansas Production Credit Association and signed by Junior White, which indicate that livestock offered as a part of the security would be kept on lands owned by Junior and James D. White. In some of the applications the acreage is given as 734 and in others as 845. The inventory on which the sale and purchase agreement between the two brothers were based, said to have been prepared by Junior, listed the acreages as 665. According to the testimony, tract 5 contained either 44 or 45 acres and tract 8 about 26 acres. The only way we can account for the difference between the acreage shown on the loan application and that shown on this inventory is by assuming that Junior White was then representing that these two tracts constituted a part of the property owned by him and his brother.[2] This would be possible only if Daniel were actually the true owner of tract 5 or an interest in the two tracts. Neither testified that these tracts were included in the purchase agreement. The president of the credit association testified that both brothers joined in a mortgage on the land to the association. Appellant Shirley White, wife of Daniel, testified that during the 13 years of her marriage, she had heard many discussions between the brothers relative to this tract and that both Junior and his wife June always referred to the land as belonging to Daniel.

Junior White explained his brother's conveyance of the land to him as a payment of an indebtedness Daniel owed him. He said that his check was sent to Daniel in 1965 because the brothers had briefly operated as partners and that the land was rented to Turner as a part of that operation. He claimed that Turner did not pay the agreed rent and that he sent it all to James in order to avoid the necessity for an explanation. He was

[2]The difference between the acreage on the first application (734) and that on the other two (845) may be accounted for by the fact that the partnership purchased additional land between the time the first application was made and the date of the second.

unable to give any explanation of what he meant by the $100 item designated as his own rent.

The only defense asserted by appellees to this portion of appellants' complaint was a general denial. The statute of frauds is not applicable as to this phase of the case, because it was not pleaded or relied upon, either as a defense or a basis for affirmative relief. See *Arnett v. Lillard*, 245 Ark. 939, 436 S.W. 2d 106. Be that as it may, the evidence tending to show a constructive trust is clear, cogent and convincing. Any doubt about the quantum of proof is resolved by Junior's letter transmitting rents and his inability to give a reason for paying rent to Daniel consistent with his denial of the trust. See *Walker v. Biddle*, 225 Ark. 654, 284 S.W. 2d 840. The statute of frauds has no application to such a trust. Ark. Stat. Ann. § 38-107 (Repl. 1962); *Davidson v. Sanders*, 235 Ark. 161, 357 S.W. 2d 510; *Walker v. Biddle*, supra. Equity regards one, who acquires the legal title to land by means of an intentionally false and fradulent verbal promise to reconvey it to the grantor but who retains, uses and claims the lands as his own, as the holder of the property charged with a constructive trust and will compel a conveyance according to the original promise. *Pharr v. Fink*, 151 Ark. 305, 237 S.W. 728; *Moore v. Oates*, 143 Ark. 328, 220 S.W. 657. Where the promise is made by one who stands in a confidential relation to the grantor, equity will impose the. trust without proof of actual fraud or any other evidence that the promisor had the intent to defraud at the time of the representation. *Davidson v. Sanders*, supra; *Kingrey v. Wilson*, 227 Ark. 690, 301 S.W. 2d 23; *Robertson v. Robertson*, 229 Ark. 649 317 S.W. 2d 272. The relationship of siblings, in the absence of estrangement or other unusual circumstances, is one of confidence, and they are usually not regarded as dealing with one another at arm's length. *Walker v. Biddle, supra;* see also, *Armstong v. Armstrong*, 181 Ark. 597, 27 S.W. 2d 88.

There is nothing here to indicate estrangement or unusual circumstances that would prevent the operation of the equitable rule. The content of the letter written by Junior to Daniel transmitting the check for $169 in

1955 belies any possible contention that the usual confidential relationship did not exist.

While the statute of limitations was not pleaded as a defense to this part of the action, it would not bar Daniel's claim because his cause of action did not arise until Junior repudiated the trust by a refusal to reconvey. *Walker* v. *Biddle*, supra. Laches was not pleaded as a defense either, but it would not apply because we cannot say that Junior's repudiation of the constructive trust occurred before appellees filed an answer to the original complaint of appellants, after which appellants, being put on notice that Junior claimed to own this land, amended their complaint to seek a reconveyance of this tract. See *Pharr* v. *Fink,* supra.

Not only do we disagree with the chancellor's holding as to this tract of land, we do not agree that appellees were entitled to a return of the lands they agreed to sell Daniel or that the payments made by Daniel should be credited to the agreed purchase price for personal property. Although it is not clear to us from the decree that the chancery court's result was reached by applying the statute of frauds, it is suggested by appellant that this is the case. Junior White testified that the title to the land in question was in him and his wife prior to the formation of the partnership. There is no evidence to the contrary. Neither Junior nor June White signed any agreement setting out the terms of the sale. There is no difference between Daniel and Junior as to the existence of an oral agreement except as to the conditions that Daniel claimed were placed on the sale by him, *i.e.,* that the purchase price was to be paid in full and that the partnership be in full operation at the time of the transfer of title.

The statute of frauds does not bar the right of Daniel to have the contract performed. Payments were made by him on the purchase price of all the property. Part payment alone would not take the agreement out of the statute of frauds. But there was much more than that involved here. The lands are referred to in the decree as having been contributed to the partnership by appellees. Part payment of the purchase price, accompaned by an entry into possession under the contract does

take the transaction out of the statute. *McKim* v. *Mc-Liney*, 250 Ark. 423, 465 S.W. 2d 911. This rule is particularly applicable where both parties agree that a contract was made, but are not fully in agreement as to the terms. *Marshall* v. *McCray*, 241 Ark. 184, 406 S.W. 2d 863. There is no room to doubt that possession was delivered and taken under the contract. Junior admitted that he and his brother had dealt with each other as if Daniel already owned a half interest in the land. It was admitted that the partnership operated the property during 1967, 1968 and 1969 and that the payments on the purchase price were made during those years. No rents were paid to Junior White. At one point in his testimony Junior admitted that the sale took place on either January 23 or February 1, 1967 and that he had collected interest from January 23. C. M. Angel, a certified public accountant, drew up financial statements for the partnership from books of accounts kept by the partners jointly in 1967 and 1968. Angel had been employed by Junior White for the same purpose prior to the formation of the partnership. In these statements he included lands valued at $66,365.00 based on cost to the partnership which he said was a figure arrived at before the partnership purchased additional lands. These statements showed that the brothers were equal partners at all times. According to this accountant, the two brothers drew equal amounts from the partnership operation from time to time. The total equity of each of the partners at the commencement of the partnership was shown by him to amount to $63,742.47. When we couple this evidence with the loan applications signed by Junior showing that the two each owned a half interest in the land, there seems to be a clear preponderance of the evidence that there was a present sale of the lands to Daniel with the conveyance to be made when the purchase price was paid. The fact that neither of the appellees took any step to recover possession of this real estate until appellants filed suit for dissolution of the partnership is not without significance. Neither is the fact that Junior White testified that, in efforts to achieve a dissolution of the partnership by agreement, he asked Daniel to make a "buy or sell" offer on lands consisting of either 803 or 805 acres.

June White is not in position to avail herself of the statute of frauds either. Daniel testified that he and his wife lived in Junior's home for four months when they first returned from California in January 1967 to commence the partnership operation pursuant to an agreement between the brothers; that the entire transaction and agreement were discussed in the presence of June White and Shirley White; and that June not only failed to register any objection, but actually agreed to the terms negotiated by the brothers in California but entered into in Arkansas. Daniel also testified that June White attended the partnership meetings, took an active interest in partnership affairs, and had as much to say at the meetings as anyone. According to Daniel, the inventory of the property which was the subject of the sale to him was actually made out in the home of Junior and June White in January of 1967. An aunt of the two brothers testified that in a conversation she had with Junior in the presence of June she upbraided Junior for not carrying out the land sale, that Junior said he could not because of "income tax purposes," and that June did not deny any of the statements made in this conversation.

Shirley White corroborated her husband's testimony about the family discussions of the agreement and the partnership meetings. June White joined in the execution of a real estate mortgage to secure loans for partnership purposes.

Junior White admitted that appellants lived in his home for about four months but said there was little discussion of the partnership. June White admitted being present at discussions when the land sale and the partnership were agreed upon, but said that she did not enter into the agreement and that if Daniel ever paid all that he owed appellees, she would then consider signing "my part over to him," if "it would still go in partnership." She admitted writing a letter to appellants while they were still in California referring to "our and your land," although she was of the opinion that appellants did not own any land in White County. There is no evidence that she protested or advised anyone that she did not consider herself bound by her husband's

agreement or that she had reservations about joining in a conveyance of the land. The clear preponderance of the evidence shows that June White knew of the agreement between the brothers and even if her silence did not constitute an outright acquiescence in the contract, she is estopped to deny the agreement and to assert the statute of frauds. See *Brownfield* v. *Bookout,* 147 Ark. 555, 228 S.W. 51; *Nicholas* v. *Ward,* 205 Ark. 318, 168 S.W. 2d 1095; *Kinney* v. *Patterson,* 225 Ark. 393, 282 S.W. 2d 809.

We cannot say that the chancellor erred in denying compensation to Daniel for his services in conducting the business of the partnership, as appellants contend. No partner is entitled to remuneration for acting in the partnership business, except as provided in the partnership agreement or as the survivor of a partnership terminated by the death of a partner. Ark. Stat. Ann. § 65-118 (Repl. 1966). While there might be equitable grounds in some cases for awarding compensation to a living partner inordinately burdened with the work of winding up and liquidating a partnership, particularly when it is necessary to carry on a business in order to successfully liquidate it, apparently the chancellor found that the circumstances did not warrant the allowance claimed in this case. Daniel admits there was no agreement to pay him the $140 per week he drew as salary. The testimony as to the cause of the dissolution of the partnership is in sharp conflict. The brothers agree that it actually was terminated in February 1970 and that Daniel thereafter managed the business and controlled its assets. The accountant showed that a profit was realized in 1970 and 1971. Junior quit working and abandoned the partnership in February 1970, after having quit assisting with the partnership books in January 1969. Junior claims that Daniel violated the partnership agreement by assuming full control of the management and operation.

The partnership agreement fixed no definite term and, after its termination in February 1970, Daniel White had no authority to continue the partnership business except in winding up its affairs. Yet he appears to have done so and to have taken no actual steps toward wind-

ing up the partnership business until the complaint was filed in this action on October 8, 1970.

The decree of the chancery court is affirmed except as it relates to the lands deeded by Daniel to Junior in 1954 and to the return to appellees of lands contributed by them to the partnership and to the application of the payments made by Daniel to Junior White. The cause is remanded for further proceedings consistent with this opinion.