Helen BOTTENFIELD *v.* Thomas WOOD, Larry A. (Dank) MILLER and Marion MILLER

78-78                                    573 S.W. 2d 307

Opinion delivered November 6, 1978
(In Banc)
[Rehearing denied December 18, 1978.]

*McKay, Chandler & Choate,* for appellant.

*Anderson & Crumpler,* for appellees.

DARRELL HICKMAN, Justice. This appeal is from a decision of the Columbia Chancery Court regarding the ownership of about thirty-three acres in Columbia County. Helen Bottenfield, the appellant, claimed that a deed to this property required the appellees to hold the land in trust to be divided equally between all the heirs of Emma Payne Miller, the deceased mother of Helen Bottenfield.

The chancellor found that the trustees held title to the property in trust for the heirs of Emma Miller, to the exclusion of Mary Moses, a daughter. The court considered the value of sixty acres in Louisiana (which Emma Miller had conveyed in 1971 to three of her children, including Helen

Bottenfield) and the value of the property in Arkansas, and arrived at a finding that Helen Bottenfield should have an undivided one-thirty-second interest in the Arkansas property, which would be a just and fair interest considering all the evidence. Mrs. Bottenfield contended that she was entitled to a one-ninth interest.

Mrs. Bottenfield appeals alleging three errors: the court lacked the legal authority to reduce the quantity of appellant's beneficial interest; the court failed to give Full Faith and Credit to a Louisiana decree; and, the chancellor's decision ignores the doctrine of *res judicata*.

Emma Payne Miller executed a will in May of 1968, leaving all her property to seven surviving children and one share to two children of a deceased son. The will specifically excluded her daughter, Mary Miller Moses, from sharing in any of the real property. Shortly thereafter, in July of 1968, she executed a quitclaim deed to about thirty-three acres to Thomas Wood, Larry Miller and Marion Miller as "Trustees". Wood was a son-in-law, Larry Miller was a son, and Marion Miller was a grandson. The word "Trustees" was the extent of the description of the trust.

After Mrs. Miller died and executors were appointed for her estate, they filed suit in Louisiana to set aside the Louisiana deed alleging that it was executed without consideration. The deed recited a consideration of one hundred dollars. The probate court in Louisiana ruled that there was adequate consideration and quieted title in that land to the three daughters.

This suit in Arkansas originated when the three "trustees" filed suit for specific performance of a contract for sale of the land and to prevent Helen Bottenfield from claiming an interest in any of the Arkansas property. This claim was dismissed and the case proceeded to trial on Bottenfield's counter-claim praying that title be quieted to her in an undivided one-ninth interest.

It was Mrs. Bottenfield's burden, of course, to prove the existence of a trust. *Kansas City Life Insurance Co.* v. *Taylor,* 184 Ark. 772, 43 S.W. 2d 372 (1931).

A good deal of oral testimony was offered to prove the trust, but it was conflicting, and not clear and convincing as to the existence of the trust or its purposes. The quitclaim deed was executed in a lawyer's office in Magnolia, Arkansas, and the witnesses who were present when the deed was signed gave varying testimony regarding what transpired.

Fay Miller Wood, the wife of Thomas Wood, one of the "trustees", who was present when the deed was signed, testified that it was her mother's intention that the Arkansas property be held in trust to be distributed according to her will; that is, to evenly divide the property but exclude the daughter, Mary Moses, who had received property during the lifetime of her mother. She said there was no distinction made between the Louisiana and Arkansas land. At one point she testified that it was her mother's intention for the three grantees to make up their own minds how the property was to be distributed.

Marion Miller, listed as a "trustee", testified that he was present when the deed was executed. He said that his grandmother wanted to get the property out of her name so she wouldn't be bothered by it. He said that "she wanted to get it out of her name so she could live in peace, or something like that." There was evidence Mrs. Miller was being pressured to favor one or more of her children by distributing her property before her death. He went on to state that he asked the lawyer in his grandmother's presence to explain to her if she knew what she was signing; that if she signed it, those getting the property could sell it the next day. He said he was given no instructions whatsoever about the land.

Thomas Wood, one of the "trustees" who was not present when the deed was signed, said "I figured Mrs. Miller figured that I would give each one of the children a fair shake in the settlement". He felt that since Mrs. Bottenfield had received an interest in the Louisiana land she was not entitled to any of the Arkansas land.

Larry Miller, another "trustee" who was not present when the deed was signed, said that he thought his mother's purpose was to get the property out of her name so she

wouldn't have to worry about it. He went on to state that he never received any instructions.

Mrs. Bottenfield was not present when the deed was executed.

The so-called trust contained in the deed fails as an express trust because it violates the statute of frauds. Ark. Stat. Ann. § 38-106 (Repl. 1962); *Restatement (Second) of Trusts,* § 40 (1959). Parole evidence is not admissible to prove an express trust. *Hawkins v. Scanlon,* 212 Ark. 180, 206 S.W. 2d 179 (1947). (See, also, Ark. Stat. Ann. § 50-412 [Repl. 1971] on the effect of such language in an instrument when title is passed to a third party.)

The obvious question then is: Did the so-called trustees take the property in fee, or was the evidence sufficient to create a resulting or constructive trust, which may be proved by parole evidence? Ark. Stat. Ann. § 38-107 (Repl. 1962); *Harbour v. Harbour,* 207 Ark. 551, 181 S.W. 2d 805 (1944).

We find no evidence to support a finding that the trust would be a resulting trust. A resulting trust arises in one of the following situations: where a private or charitable trust fails in whole or in part; where a private or charitable trust is fully performed without exhausting the trust estate; and, where property is purchased and the purchase price is paid by one person and at his direction the vendor transfers the property to another person. *Restatement (Second) of Trusts,* § 404 (1959).

The evidence is insufficient to support a finding that there was a constructive trust. There must be clear, cogent and convincing evidence of fraud, or a confidential relationship to establish a constructive trust. *Robertson v. Robertson,* 229 Ark. 649, 317 S.W. 2d 272 (1958).

There was no such evidence in this case. There was no allegation of fraud or false inducement on behalf of any of the grantees. In fact, the evidence is to the contrary.

One grantee, the only one present when the deed was signed, said he wanted his grandmother to know that he, a

grantee, understood the property could be disposed of the next day. The other two grantees, not present when the deed was signed, received no instructions, and had to surmise her intent. One arrived at his understanding of his duty by "figuring what she figured."

Simply because the grantees were related to Mrs. Miller could not, alone, create a confidential relationship imposing a constructive trust on the land. See *Jones* v. *Gachot,* 217 Ark. 462, 230 S.W. 2d 937 (1950).

Consequently, we have a situation where the trust fails, is void and the grantees may dispose of the property in fee as they see fit. The grantees' duty, if any such duty exists by virtue of the deed, would be moral and not legal. Bogert, *The Law of Trusts and Trustees,* § 69 (2d ed. 1965).

The trustees did not elect to dispose of the property in fee. They elected not to appeal the decision of the chancellor awarding Mrs. Bottenfield a one-thirty-second interest in the Arkansas property.

The net result of the appellees' failure to appeal is that the decision of the chancellor will be affirmed. The appellant, Bottenfield, for the reasons stated herein, has failed to make a case that a trust existed and, therefore, her appeal must fail.

The arguments of the appellant regarding *res judicata* and Full Faith and Credit are irrelevant. The appellant's entire case depends on whether or not she could prove, as the law requires, that the trust existed. *Harbour* v. *Harbour, supra.* She could not prove an express trust by parol; there is insufficient evidence to support a finding that there was a resulting or constructive trust; and, consequently, her claim must be denied.

Affirmed.

FOGLEMAN, J., dissents.

JOHN A. FOGLEMAN, Justice, dissenting. The defense to Helen Bottenfield's counterclaim was that she had secured,

for an inadequate consideration, an unfair and major portion of the property of Emma P. Miller and that it would be inequitable to allow her to share in any part of the property conveyed by Emma P. Miller to Thomas Wood, Larry A. (Dank) Miller and Marion Miller. There was no denial in the amended response of appellees, of appellant's allegation that the only consideration for the quitclaim deed from Emma P. Miller to Thomas Wood, Larry A. (Dank) Miller and Marion Miller was the promise and covenant of the grantees that they would hold the property in trust for all of the heirs of Emma P. Miller. There was never any mention of the statute of frauds in any pleading filed by any party to this litigation. The case was not tried as if that was an issue. The chancellor's opinion and decree do not treat it as an issue.

Helen Bottenfield testified that all three trustees named in the deed had testified on the taking of depositions that they held title in trust for all of Mrs. Miller's children, except Mary Moses, and that at least one of them said that the property was to be distributed according to a will executed by Mrs. Miller and admitted to probate. This will was consistent with a division among all the children, except Mary Moses, who was excluded by the terms of the will, apparently because Mrs. Moses had been deeded other property and because her mother felt that Mrs. Moses was harassing her about the property in an effort to obtain more than her share.

A sister of appellant, Fay Miller Wood, wife of Thomas Wood, was present when the deed was signed. She also testified that the grantees were holding the property in trust for distribution of Mrs. Miller's property according to her will and that it was the duty of the trustees to see that the will was carried out. Thomas Wood testified that it was his understanding that he and the other two trustees had title to the property as trustees for all the children, to be divided among them according to the terms of the will of Mrs. Miller. He stated that he recognized appellant as an owner of the Arkansas property and said that "before the will" she would own 1/9 of it and "after the will," she would own her pro rata share of it and, that, in his opinion, she still owns it.

Larry Miller, a son of Mrs. Emma Miller, testified that his mother wanted to get the property out of her hands, so she

would not have to worry about it; that she wanted it divided among all the kids, but that Mary was not supposed to get any of the Arkansas property. He said that she never told him, after she made the deed, *exactly* what she wanted done with the property. He also testified that, after the quitclaim deed was executed, as far as he was concerned, the property was still her property, but under the control of the three trustees. It was his understanding that he had held the property in trust for his mother and that he still did. According to him, the sole purpose of the deed was to prevent Mary Moses from getting the property, but he thought that Mary would share in the Louisiana property.

Marion Miller, a grandson of Mrs. Emma Miller, testified that she made the deed so she wouldn't be worried about people, including him, taking it from her and that three people would have to agree with any disposition of that land. He said that, if it got down to legal aspects, the three grantees were trustees and that his grandmother had said that she wanted to put the land in the name of the three to keep Mary from getting any more of it.

The chancellor clearly recognized that the statute of frauds was not an issue. In his letter opinion, he expressed the opinion that Thomas Wood, et al, trustees in the 1968 quitclaim deed, hold title to said property *in trust for the heirs* of Mrs. Emma P. Miller to the exclusion of Mary Moses, without making any mention of the statute of frauds. He referred to the will of Mrs. Miller, by which she devised her real property to all of her nine children except Mary Moses.[1]

---

[1]The text of Mrs. Miller's will is as follows: "I give and bequeath to my following named children: Opal Miller Smith, Floy Miller Dodson, James Ralph Miller, Marion Miller and Ricky Miller grandchildren and children of Woodrow Miller, deceased, Faye Miller Wood, Hazel Miller Rakes, Larry A. Miller, Sr., Helen Miller Bottenfield share and share alike all my personal property, real property, oil and gas mineral interests that I may be possessed of at the time of my death. My two grandchildren, Marion Miller and Ricky Miller to receive the interest in my estate that would go to my deceased son, Woodrow Miller. My other daughter, Mary Miller Moses, to receive the same share in my estate as the other children mentioned herein, save and except an interest in the real estate that I should be possessed of at the time of my death to which I leave no interest, she already having received her interest in real estate by deed from me in former years. I hereunto set my hand this 27th day of May, 1968." Signed Emma Payne Miller.

For some reason, the chancellor stated that, in order to determine whether Mrs. Bottenfield was entitled to any interest in the Arkansas property, it would be necessary to receive additional evidence as to the value of the Louisiana and Arkansas properties. He recited the fact that in September, 1971, Mrs. Emma Miller had conveyed her Louisiana land to Helen Bottenfield, Opal Smith and Mary Moses. He also recited that Mrs. Bottenfield had successfully defended a suit to set aside the deed to the Louisiana land, and recognized that the Louisiana court had found that the $100 paid for the Louisiana land was sufficient to support the conveyance and that there was additional valuable consideration for the deed in the form of personal services performed by Mary Moses and her children. (The chancellor overlooked the fact that the Louisiana court had found that, as a part of the consideration for the Louisiana deed, the grantees had promised that the grantor would not be put into a nursing home and that the promise had been kept.)

After hearing evidence on land values, the Arkansas court entered a decree, which in effect nullified the Louisiana deed and distributed the Arkansas property, not according to Mrs. Miller's will, but as the chancellor seemed to think she should have done. The court found: the value of surface and mineral interests of the Louisiana property was $41,868.20; the value of the Arkansas property was $75,300; as a result of the deed conveying the Louisiana property, Helen Bottenfield, "one of the major heirs of Emma P. Miller," received an undivided 1/3 of an undivided 2/3 of the Louisiana property, which was valued at $9,304.04; if she acquired an undivided 1/32 of the Arkansas property, it would have a value of $2,353.13, making a total value of the Arkansas and Louisiana property to be received by Helen Bottenfield of $11,657.17; that each one of the "major heirs of Emma P. Miller," except Helen Bottenfield and Mary Moses, receive 1/3 of 2/3 of 1/7 of the Louisiana property,[2] having a value of $13,029.15; that if each of said "major heirs" receives 1/7 of 31/32 of the Arkansas property, their interest each will be a value of $10,420.19, which "added to the Louisiana prop-

---

[2]Mrs. Opal Smith conveyed her interest in the Louisiana property to herself and the other children, except for Helen Bottenfield and Mary Moses.

erty" would total $11,750.13. The court then found that Helen Bottenfield's just and equitable interest in the Arkansas property should be an undivided 1/32 interest.

In his letter opinion, the chancellor had stated that there was testimony by some of the appellees, that, before Mrs. Bottenfield acquired the Louisiana deed, they recognized that she was *entitled* to an interest in the Arkansas land but thought that she had received her share, or more than her *fair* share, of the estate by her acquisition of the 20 acres in Louisiana. The chancellor apparently felt that the defense asserted by appellees was a good one.

The statute of frauds was not mentioned in the briefs in this case. It is notable that Mrs. Miller's will only devised real estate of which the testatrix might be possessed at the time of her death. Mrs. Emma Miller had an absolute right to convey or dispose of any of her property as she chose, and one of the appellees so testified. She conveyed the Louisiana property to three of her children. There was no evidence that she was incompetent. One of the appellees, who was a party to the lawsuit, testified that, as far as he knew, Emma Miller was mentally all right on the date the Louisiana deed was executed. No issue as to her competency was made. There was no evidence of undue influence.

In appellant's reply brief, she agrees with appellees that there was no express trust, because it was not reduced to writing. She does argue, however, that there was a resulting trust. With this argument, I agree, and, as a matter of fact, all the parties agreed and the chancellor so found. Although the implied trust is probably more properly denominated as a constructive trust, the general rules are found in §§ 44 and 45, Restatement of the Law, Trusts 2d 113, 118, and not in § 404.[3] They are (including pertinent comments):

§ 44. Effect of Failure of Oral Trust for the Settlor.

(1) Where the owner of an interest in land trans-

---

[3]Regardless of the absence of an issue as to the statute of frauds, we find ourselves in the same position we would be in if it had been raised, i.e., what happens to the property when it is conceded that an express trust has not been established.

fers it inter vivos to another in trust for the transferor, but no memorandum properly evidencing the intention to create a trust is signed, as required by the Statute of Frauds, and the transferee refuses to perform the trust, the transferee holds the interest upon a constructive trust for the transferor, if

***

(b) the transferee at the time of the transfer was in a confidential relation to the transferor, or

***

(2) Where the owner of an interest in land transfers it inter vivos to another in trust for the transferor, and the transferor's intention to create a trust but not the identity of the beneficiary is properly manifested, and the transferee refuses to perform the trust, the transferee holds the interest upon a resulting trust for the transferor.

Comment on Subsection (1, b):

*c. Where transferee is in a confidential relation to transferor.* *** Such a confidential relation exists not only where there is a fiduciary relation such as exists between attorney and client, trustee and beneficiary, guardian and ward, and the like, but also where because of family relationship or otherwise, the transferor is in fact accustomed to be guided by the judgment of the transferee or is justified in placing confidence in the belief that the transferee will act in the interest of the transferor. ***

Comment on Subsection (2):

*e. Where conveyance is "in trust."* Where the owner of land transfers it inter vivos to another by an instrument which states that the transfer is made "in trust," or is made to the transferee "as trustee," but the beneficiary

is not designated in the instrument, and the transferee orally agreed with the transferor at the time of the transfer to hold the land in trust for the transferor, the transferee holds it upon a resulting trust for the transferor. In the case of such an instrument, however, the parol evidence rule does not exclude extrinsic evidence that no trust was intended to be created (see § 38, Comment *d*); and if the evidence shows that no trust was intended to be created, the transferee can keep the property and no resulting or constructive trust arises. As to the situation where the intended trust was for a third person, see § 45, Comment *e*.

Illustration:

6. A transfers Blackacre to B by a deed which recites that the transfer is to B "as trustee" but does not state who is the beneficiary or what is the purpose of the trust. At the time of the transfer B orally agrees to hold Blackacre in trust for A. B subsequently refuses to perform his promise. B holds Blackacre upon a resulting trust for A, and A can compel B to reconvey Blackacre to him.

§ 45. Effect of Failure of Oral Trust for a Third Person.

(1) Where the owner of an interest in land transfers it inter vivos to another in trust for a third person, but no memorandum properly evidencing the intention to create a trust is signed, as required by the Statute of Frauds, and the transferee refuses to perform the trust, the transferee holds the interest upon a constructive trust for the third person, if, but only if,

\*\*\*

(b) the transferee at the time of the transfer was in a confidential relation to the transferor, or

\*\*\*

(2) Except under the circumstances stated in Subsection (1, a, b, c), where the owner of an interest in land transfers it inter vivos to another in trust for a third person, and the transferor's intention to create a trust but not the identity of the beneficiary is properly manifested, and the transferee refuses to perform the trust, the transferee holds the interest upon a resulting trust for the transferor.

Comment on Subsection (1):

*a. Where the transferee orally agrees to hold land in trust for a third person.* \*\*\*

As will appear in the Comments which follow, a constructive trust for the third person will be enforced where the transfer was wrongfully obtained (see Comment *b*); or where the transferee was in a confidential relation to the transferor (see Comment *c*); or where the transfer was made in anticipation of the death of the transferor (see Comment *d*). Where, however, there was merely an oral promise by the transferee which he later refuses to perform, the third person is not entitled to the property, since the promise is unenforceable because of the Statute of Frauds.

The question remains whether the transferee should be permitted to keep the property in spite of his promise, or should be compelled to hold it upon a constructive trust for the transferor or his successors in interest.

Although it is very generally held in the cases that the third person is not entitled to the property, except under the circumstances stated in this Section, it is not so clear that the transferee is entitled to keep the property. The argument for enforcing a constructive trust for the transferor is that the transferee would be unjustly enriched if, in spite of his promise, he were permitted to retain the property, and that evidence of the oral promise is admissible, not for the purpose of enforcing the in-

tended trust for the third person, but for the purpose of restoring the property to the transferor.

Comment on Subsection (1, b):

*c. Where transferee is in a confidential relation to transferor.* Where the owner of land transfers it inter vivos to another in trust for a third person, but no memorandum properly evidencing the intention to create a trust is signed, the transferee will be compelled to hold the land upon a constructive trust for the third person, if the transferee at the time of the transfer was in a confidential relation to the transferor. This is true even though at the time of the transfer the transferee intended to perform the oral trust, and even though he was not guilty of undue influence or other abuse of his confidential relation to the transferor in procuring the transfer. In such a situation a wrong is committed not merely against the transferor but also against the third person; and a court of equity will specifically redress the wrong by putting the parties in the position in which they would have been if the wrong had not been committed.

Comment on Subsection (2):

*e. Where conveyance is "in trust."* Where the owner of land transfers it inter vivos to another by an instrument which states that the transfer is made "in trust," or is made to the transferee "as trustee," but the beneficiary is not designated in the instrument, and the transferee orally agreed with the transferor at the time of the transfer to hold the land in trust for a third person, the transferee will not be permitted to hold the land free of trust. Under the circumstances stated in Subsection (1, a, b, c), he will be compelled to hold the land upon a constructive trust for the third person.

In the absence of any of the circumstances stated in Subsection (1, a, b, c), he will be compelled to hold the land upon a resulting trust for the transferor, if he refuses to perform the oral trust for the third person or to execute a memorandum binding upon himself to per-

form the oral trust. See § 411, Comment *p*. If, however, he is willing to perform the oral trust, he can properly do so (see § 43), and in that event the transferor cannot enforce a resulting trust for himself. So also, if the transferee signs a memorandum properly evidencing the oral trust, the trust becomes enforceable by the third person (see § 42), and in that event the transferor cannot enforce a resulting trust for himself. If, however, the transferee signs a memorandum declaring that he holds the land upon a trust different from the oral trust, the memorandum is not sufficient to satisfy the requirements of the Statute of Frauds, and the trust so declared cannot be enforced (see § 42, Comment *h*), and the transferor can enforce a resulting trust for himself.

Illustration:

4. A transfers Blackacre to B by a deed which recites that the transfer is to B "as trustee," but does not state who is the beneficiary or what is the purpose of the trust. At the time of the transfer B orally agrees to hold Blackacre in trust for C, and subsequently refuses to perform his promise. If B procured the transfer by fraud or other wrongful conduct, or if he was in a confidential relation to A, or if the transfer was made by the transferor in contemplation of death, B holds Blackacre upon a constructive trust for C, and C can compel B to convey Blackacre to him. In the absence of any of these circumstances, B holds Blackacre upon a resulting trust for A, and C cannot compel B to convey Blackacre to him, unless B signs a memorandum of the trust for C; but if B transfers Blackacre to C, A cannot enforce a resulting trust in his own favor.

Insofar as the ultimate outcome of the case is concerned, it makes little difference whether a confidential relationship existed. The evidence in this case shows that there was a family relationship between the grantor and grantees in the quitclaim deed, and that Emma Miller was justified in the belief that the grantees would act in her interest. If so, Helen Bottenfield was entitled to enforce the oral trust and to have the property which had been conveyed to

the trustees distributed according to the will of Emma Miller. If a confidential relation did not exist, the trustees were not entitled to do as they wished with the property, but rather held as trustees for Mrs. Miller. In this event, the property would revert to Mrs. Miller's estate and would also pass under the terms of her will. Appellant only sought 1/9 of the property. It seems to me that she was entitled to that much at least.

Although I might agree that the simple fact that the grantees in the deed were relatives was not sufficient to create a resulting or constructive trust, I think that the reference to *Jones* v. *Gachot*, 217 Ark. 462, 230 S.W. 2d 937, is inappropriate. In that case, it is pointed out in the second sentence of the opinion that there was nothing in the deed involved there to indicate, or even suggest, that the grantees (nephews of the grantor) received the title in any way except as the owners thereof. This court stated that there was nothing more than an effort to establish an oral express trust. This fact was emphasized in the concurring opinion in that case. Here, there was no effort to establish an express trust. The word "trustees" following the names of the grantees is a clear indication that the grantor placed her confidence in the grantees to accomplish some purpose. This should be treated as a confidential relation. We have, subsequent to *Jones,* said, in upholding an alleged constructive trust, after referring to Restatement, Trusts, § 44, that the relation between relatives (brother and sister) is, in the absence of estrangement or other unusual circumstances, one of confidence. See *Walker* v. *Biddle,* 225 Ark. 654, 284 S.W. 2d 840. See also, *White* v. *White,* 254 Ark. 257, 493 S.W. 2d 133.

The problem presented here is not without difficulty and it is solved in different ways in different jurisdictions. According to *Scott on Trusts* (3d Ed.), § 45, in a situation where the proof is insufficient to establish the existence of an oral trust in land, most jurisdictions hold that the title to the property is vested in the grantee, or alleged "trustee".

> * * * If A conveys land to B upon an oral trust for C or upon an oral contract to convey to C, it is clear that the Statute of Frauds prevents the enforcement of the ex-

press trust or contract. What then shall be done with the land? There are three possible views: (1) that B should be allowed to retain the land; (2) that a constructive trust should be raised in favor of C; and (3) that a constructive trust should be raised in favor of A.

It would seem clear that B would be unjustly enriched if he were allowed to retain the land. The only argument in favor of the retention of the land by B is that the Statute of Frauds forbids proof of the oral trust or contract, not merely for the purpose of enforcing it, but also for the purpose of preventing unjust enrichment. This is the view which is taken by most of the American courts; and they allow B to keep the land.[1] As has been shown, however, in the cases where the oral trust was in favor of the transferor, there is no sound objection to showing the oral trust for the purpose of preventing unjust enrichment . . . . ([1]*Fenter* v. *First National Bank,* 182 Ark. 89, 30 S.W. 2d 820; *Jones* v. *Gachot,* 217 Ark. 462, 230 S.W. 2d 937; *Robertson* v. *Robertson,* 229 Ark. 649, 317 S.W. 2d 272.)

Section 45.4 of the same work deals with conveyances to "trustees," where there is no further reference to the trust or its purposes.

* * * Where the conveyance is made to the grantee "in trust" or "as trustee," and the purposes of the trust do not appear in the instrument, but it is shown by oral evidence that the grantee agreed to hold the land in trust for a third person, it is clear that the grantee will not be permitted to keep the land. He cannot be compelled to perform the trust, however, since to compel him to do so would be in violation of the Statute of Frauds. Accordingly, if the grantee refuses to perform the trust, he can be compelled to reconvey the land to the grantor. The intended trust failing, the grantee holds the land upon a resulting trust for the grantor.

Appellant has always taken the position that this is a resulting trust.

Dr. (then Justice) Leflar, agreeing with the majority in *Jones* that the establishment of a constructive for the benefit of the grantor, or his successors, had not been sought and that the statute of frauds would not have applied to a constructive trust, recognized that there were various approaches and pointed out the weight of authority on the subject in his concurring opinion. He said:

> The great weight of American authority recognizes the validity of constructive trusts under the circumstances set out in the Restatement of Trusts, § 45, as quoted in the majority opinion. Unless constructive trusts are enforced in those circumstances the statute of frauds will be made an instrument for achieving fraud, by vesting in nominal grantees the title to lands for which they have paid nothing and to which in equity and good conscience they are not entitled. Under § 38-107 it is clear that this was never the intent of the statute of frauds.

> Whether the constructive trust in such circumstances should run in favor of the ones for whom the oral trust was declared, as the Restatement suggests, thus effectuating it as though it were an express trust, or should run in favor of the grantor or his successors, on the theory that the parties should be restored as nearly as possible to the position they were in prior to the making of the deed, is another matter. Certainly, the latter disposition of the property would be more nearly in keeping with the law of constructive trusts generally. See 3 Bogert, The Law of Trusts, p. 215; 1 Scott, the Law of Trusts, p. 269. This form of relief, however, was not sought in the present case.

In my opinion, Dr. Leflar was right. The effect of the majority opinion in this case is to vest the fee simple title in a grantee in land conveyed to him "as trustee." There are jurisdictions where this is done. Arkansas should not be one of them. It results in an unconscionable, unwarranted and unintended unjust enrichment of such a grantee — a highly undesirable result, regardless of how the "fireside" equities may appear in this case. Either of the other options available

to us is highly preferable. Either would redound to the benefit of appellee and require reversal of the decree.

I would reverse the decree and award appellant 1/9 of the property, or 1/8 of it, subject to any debts of the estate which might require resort to the real estate.