**DELTA PRIDE CATFISH, INC., Individually, and on Behalf of All Others Similarly Situated, Plaintiff,**

v.

**MARINE MIDLAND BUSINESS LOANS, INC., and Atkinson & Company Truck Brokers, Inc. and Walter M. Dickinson, as Trustee in Bankruptcy for Atkinson & Company Truck Brokers, Inc., Defendants.**

No. LR–C–89–889.

United States District Court,
E.D. Arkansas, W.D.

June 19, 1991.

Richard C. Bradley, III, James R. Mozingo, Stennett, Wilkinson & Ward, Jackson, Miss., and Anthony J. Sherman, Sherman & James, Little Rock, Ark., for plaintiff Delta Pride Catfish, Inc.

Frederick S. Wetzel, III, Wetzel & Pruniski, Little Rock, Ark., for Atkinson & Co. Truck Brokers, Inc. and Walter M. Dickinson.

John E. Tull, III and David F. Menz, William & Anderson, Little Rock, Ark., for defendants.

MEMORANDUM OPINION

SUSAN WEBBER WRIGHT, District Judge.

In this case a truck hauler alleges a scheme by a truck broker and its lender to divert monies collected from shippers to pay off the truck broker's business loan rather than remitting those funds to the haulers. Plaintiff Delta Pride Catfish, Inc. (Delta Pride) sued Marine Midland Business Loans, Inc. (Marine Midland), alleging that Marine Midland seized $31,500 belonging to Delta Pride in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68, as well as state laws prohibiting breach of trust, fraud, and conversion.[1] Delta Pride also joined Atkinson & Company Truck Brokers, Inc. (ATB) and Walter M. Dickinson, trustee in bankruptcy for ATB, as defendants on the counts of breach of trust, fraud, and conversion.

Marine Midland moves to dismiss or, alternatively, for summary judgment. Since the parties have put before the Court matters outside the pleadings by submitting supporting and opposing affidavits and depositions, as well as numerous exhibits, the Court will treat this motion as a motion for summary judgment. *Court v. Hall County, Neb.*, 725 F.2d 1170, 1172 (8th Cir.1984). The Court has carefully considered the testimony, exhibits, and briefs of the parties and for reasons set forth below grants summary judgment in favor of Marine Midland on all claims.

## I. FACTS

### A. Marine Midland and ATB

Prior to filing bankruptcy in August 1988, ATB operated as a truck brokerage company which arranged for transportation of freight by truck from a shipper to a designated recipient. ATB would solicit or receive inquiries from various parties who wished to ship or receive freight and

1. Delta Pride filed its original complaint on October 25, 1989 "individually, and on behalf of all others similarly situated," but did not seek class certification within the 90–day limit as required by Local Rule 24(B)(3). On August 2, 1990, Delta Pride sought leave to file an amended class action complaint, but the Court denied this motion as untimely and because the allegations in Delta Pride's complaint did not meet the requirements for a class action under Rule 23 of the Federal Rules of Civil Procedure.

would, thereafter, arrange for an individual or firm having a truck or trucks for hire to pick up the freight and deliver it to its final destination.

On January 7, 1982, ATB's predecessor, Atkinson & Company Truck Brokering, Inc., executed an accounts receivable contract with Commercial Credit Business Loans, Inc. (Commercial Credit). The contract provided that ATB would borrow money from Commercial Credit based on a percentage of the shippers' billings which were outstanding at a given time, in exchange for an assignment of and security interest in ATB's present and future accounts.

> As collateral security for all present and future obligations of Customer to Commercial Credit, Customer will and does hereby assign and pledge to Commercial Credit, and gives Commercial Credit a security interest in, all of its Accounts ... which it now owns or shall hereafter acquire or create.... On receipt of the assignments of Accounts, Commercial Credit will credit Customer with an amount up to Eighty-five Per Cent (85%) of the collateral value thereof, as determined by Commercial Credit, and also will credit Customer with the remainder of the face amount of Accounts on receipt of such payment by Commercial Credit.... Commercial Credit will loan Customer, on request, such amounts so credited or a part thereof as requested.

Defendant's Motion to Dismiss or, Alternatively, Motion for Summary Judgment [hereinafter Defendant's Motion], Exhibit 6. ATB agreed "[to] execute assignments daily so as to vest in Commercial Credit full title to and a security interest in Accounts, and Commercial Credit thereupon shall be entitled to and have all of the ownership, title, rights, securities and guaranties of Customer in respect thereto." *Id.* The contract also required ATB to forward daily to Commercial Credit all payments from shippers on the accounts receivable.

Commercial Credit properly perfected its security interest in all of ATB's present and future accounts receivable and proceeds therefrom by filing the necessary financing statements with the Circuit Clerk of Arkansas County and with the Arkansas Secretary of State. Defendant's Motion, Exhibits 7 and 8. Amendments to these financing statements were later filed changing the debtor's name to Atkinson & Company Truck Brokers, Inc.

On January 9, 1986, Commercial Credit assigned its rights under the accounts receivable contract to Marine Midland. Marine Midland filed a financing statement with the Circuit Clerk of Arkansas County and the Arkansas Secretary of State on January 10, 1986 and January 14, 1986 respectively, covering all property specified in the original Commercial Credit financing statement. Plaintiff's Exhibit 27 shows that Marine Midland's loans to ATB on the accounts receivable also were secured by the personal guaranty of ATB's president and majority shareholder, Larry Atkinson.

ATB would contact shippers and arrange for truckers to pick up and deliver individual shipments for the shippers. ATB charged the trucker a commission based upon the gross freight costs of the shipment, and sometimes advanced up to fifty percent of the cost of the shipment to the trucker for fuel, food, and other expenses. In the normal course of business, following delivery of a shipment, the trucker would provide ATB with the receipted bill of lading either in person or by mail. ATB then issued the trucker a check drawn on ATB's general checking account for the net amount owed him after deducting ATB's commission and any advances. The trucker was paid before ATB collected from the shipper.

The parties disagree over how soon a trucker was paid after delivery of the bill of lading. Delta Pride claims that when ATB invoiced the shipper, ATB's computer immediately cut a check to the trucker, but that ATB generally held the check for seven days. Glover Aff. ¶ 9. However, a statement appearing in Exhibit 52, which Delta Pride submitted in support of its response to the summary judgment motion, somewhat belies this assertion. Exhibit 52 is a copy of a form letter dated April 8, 1988 and sent by Marine Midland to a cer-

tain trucking company requesting information about the trucking company's account with ATB. The response contains the following remark from the trucking company:

> Until recently we would turn in the tickets of commodities hauled during the preceeding [sic] week on a Monday and pickup [sic] our checks on Tuesday and this is the way it should be. Now we take the tickets in on Monday and get our settlement checks on the following Monday. This throws our paying of our own bills off two weeks. They do need to get back to the old way of doing business.

Marine Midland contends that a trucker who personally delivered the bill of lading to ATB was issued a check the same day and that when ATB received the bill of lading in the mail, a check was issued the same day of receipt, but turnaround time from receipt to payment of the trucker was five to ten days. L. Atkinson Aff. ¶ 4(d).

Both parties agree that in the normal course of business ATB would pay the trucker *before* ATB received payment from the shipper. *See, e.g.*, Plaintiff's Exhibit 37 at 1000310 (1987 Marine Midland memorandum analyzing various elements of risk in ATB's operations which states that "[s]ince truckers are completely paid by the time the invoice is generated and receivables are turning in 22 days, [ATB's] tight cash flow would naturally occur"). Otherwise, the dispute over how long after receipt of the bill of lading the trucker was paid is immaterial.

Upon receipt of the bill of lading, ATB invoiced the shipper for the gross freight charge and requested that the payment be made directly to ATB. The usual turnaround time for payment from the shipper was two to three weeks. *See* L. Atkinson Aff. ¶ 4(e); J. Atkinson Aff. ¶ 4(e); Plaintiff's Exhibit 37. At the same time, ATB also would send a copy of the invoice and bill of lading to Marine Midland, who immediately provided financing on the account receivable. ATB obtained daily funding from Marine Midland for up to eighty-five percent of its accounts receivable. All monies received from Marine Midland were placed in ATB's general checking account. When ATB received payment from the shipper on the invoice, ATB endorsed the check and forwarded it the same day to Marine Midland by express mail.

In October 1987 Marine Midland became concerned about the financial condition of ATB,[2] particularly ATB's tight cash flow, the increase in ATB's accounts receivable over ninety days past due, mounting losses in ATB's wholly owned subsidiary, Atkinson Trucking Company, and ATB's increased borrowings to meet note payments on equipment owned by Larry Atkinson and used by the subsidiary. *See* Plaintiff's Exhibits 37–45. In a November 1987 loan status report, Marine Midland indicated that

> [ATB's] problem stems mainly from their subsidiary which has operated at a loss since it opened in 1985. While client's operations remain profitable, tangible net worth has dropped due to the continued increase in advances to subsidiary, with same totalling 204M [$204,000] and 528M [$528,000] as of 12/86 and 9/87 respectively.

Plaintiff's Exhibit 42.

On December 2, 1987 Marine Midland informed ATB by letter that it was terminating its accounts receivable contract effective April 1, 1988. In its termination notice, Marine Midland also demanded that payment in full be made on or before April 1, 1988, and notified ATB that its security interest would remain in effect until full payment was received and that ATB would "remain obligated to immediately transmit

---

**2.** This apparently was not the first time Marine Midland considered terminating its accounts receivable contract with ATB. According to various Marine Midland business records submitted by the plaintiff, Marine Midland notified ATB in September 1986 that it would terminate the financing relationship in January 1987. Marine Midland asked ATB to seek alternative financing primarily due to the size of the loan, but also because of assignment of third party receivables which were not owned by ATB, weak accounting records and procedures, slow financial reporting, and significant written but held checks. Plaintiff's Exhibit 31. However, Marine Midland reconsidered its position and continued its funding upon assurances from ATB that the problems would be corrected.

to [Marine Midland] all remittances received in payment of, and other proceeds collected on account of, such collateral." Plaintiff's Exhibit 46.

In anticipation of ATB securing alternative financing, Marine Midland and ATB entered into modifications of their lending agreement on March 31, 1988 and April 4, 1988 to provide that Marine Midland would continue lending to ATB until July 1, 1988, but that on May 1, 1988, Marine Midland would reduce the maximum loan amount to the lesser of $800,000 or 80% of the collateral value of the accounts and that on June 1, 1988, Marine Midland would reduce the maximum loan amount to the lesser of $700,000 or 75% of the collateral value of the accounts. Plaintiff's Exhibits 11 and 12. On July 1, 1988, the entire amount would be due. *Id.*

On April 8, 1988, Marine Midland received audited financial statements of ATB for the fiscal years ending December 31, 1987 and December 31, 1986. Thinking it had been misled by the internally generated financials ATB had earlier provided,[3] Marine Midland attempted to make new financing arrangements with ATB which would protect Marine Midland's interest and yet give ATB time to look for alternative financing. A Marine Midland internal memorandum indicates that a phone conference occurred on April 15, 1988 between J.S. Johnson, a loan officer for Marine Midland, and Janet Atkinson, office manager for ATB and wife of Larry Atkinson, in which Mr. Johnson proposed to cap the line of credit at $650,000, take a second lien on Larry Atkinson's trucks and trailers, and reduce the loan by 50% of any equity received from the lease/purchase of the company's trucks. Plaintiff's Exhibit 54. Ms. Atkinson purportedly balked at the proposal because, *inter alia*, ATB "needed all proceeds from the equity in the trucks to bring payment to truckers current." *Id.* Consequently, Mr. Johnson immediately capped the loan amount at $650,000 and refused to make any further advances in excess of this amount until the parties could discuss the matter further.

ATB ceased operations on April 29, 1988. As of that date, ATB owed Marine Midland approximately $577,400. Plaintiff's Exhibit 73. ATB's records show $770,448 in outstanding checks as of May 2, 1988 on an account apparently used to pay truckers, with $378,902 of those checks written in April 1988. Plaintiff's Exhibit 70. By comparison, outstanding checks on the same account totalled $565,504 on February 2, 1988, with $347,864 written in January 1988, and $632,366 on April 1, 1988, with $333,759 written in March 1988. Plaintiff's Exhibits 67 and 69.[4]

By letter dated May 4, 1988, ATB's attorney, Art Givens, informed Marine Midland that effective May 2, 1988, Mr. Atkinson and all former truck brokers at ATB had been employed by Terminal Truck Brokers, Inc., of Stuttgart, Arkansas. The letter further indicated that despite ATB's cessation of operations, Mr. Atkinson would continue to collect the accounts receivables and forward them to Marine Midland in accordance with the loan contract. Mr. Givens explained that "Mr. Atkinson wanted to bring this matter to your attention so that you would be assured that all of the accounts will be forwarded to you which arose out of the operation of Atkinson Truck Brokerage Company." Plaintiff's Exhibit 60.

Sally A. Pershica, regional operations manager for Marine Midland, replied in a letter dated May 11, 1988:

---

**3.** The audited financials showed that ATB lost $543,000 for the year ending December 31, 1987, and had a negative equity of $106,000. ATB's internally prepared financial statements had reported a net loss of $19,000. ATB and its accountants told Marine Midland that the discrepancies were the result of accounting errors by ATB and the conversion of the internally prepared statements from a modified cash basis to an accrual basis of accounting. Plaintiff's Exhibit 55.

**4.** Documents produced by Marine Midland and submitted as plaintiff's exhibits show that Accounts Payable Truckers amounted to the following on the dates indicated:

| Exhibit | Date | Amount |
|---|---|---|
| 34, 36 | 30 Jun 1987 | $575,591 |
| 47 | 31 Oct 1987 | $559,231 |
| 22 | 31 Dec 1987 | $639,749 |
| 51 | 29 Feb 1988 | $627,400 |

To proceed with prompt payout of all amounts owed by Atkinson to Marine, Marine will, at your request ... permit you or your employees to collect the accounts receivable outstanding on May 2, 1988 so long as all of the same are, immediately upon your receipt thereof, remitted to Marine. This remittance obligation applies to 100% of the accounts outstanding on May 2, 1988, and Marine will permit you to receive the collections (in lieu of direct payment by your account debtors to Marine) only so long as you immediately deliver such collections to Marine on a daily basis. Marine will apply the proceeds of the accounts to the principal, accrued interest and all related expenses of collection. Any excess proceeds after such application will be remitted to you.

Plaintiff's Exhibit 64. When Mr. Atkinson failed to remit the entire loan balance by May 26, 1988 and challenged Marine Midland's claim to attorney fees related to ATB's default, Jim Johnson, loan officer for Marine Midland, responded in a letter dated May 31, 1988:

To assure that we are paid in full you are hereby notified that you must hold in trust (preferably through your attorney) all proceeds of accounts receivable which you may collect or have as collected [sic] after May 26, 1988 up to an amount sufficient to pay all amounts set forth herein as due and owing, plus any future fees and expenses we may incur in attempting to collect all amounts owed by you to us.

Plaintiff's Exhibit 65. ATB paid back the loan in full by June 15, 1988.

Marine Midland's records indicate that between May 1, 1988 and June 15, 1988 Marine Midland received approximately $577,406, not including interest and attorney's fees. Plaintiff's Exhibit 73. On June 16, 1988, Marine Midland executed a conditional release of ATB which provided in part that:

The foregoing [release] is expressly conditioned on Marine not being required to return or turn over any payment of or collection with respect to the Loans to a trustee in bankruptcy or otherwise and upon no such payment or collection being otherwise recovered from Marine. In the event of any such return, turnover, or recovery, Releasee [ATB] shall, notwithstanding anything herein to the contrary, be fully liable for the amount so returned, turned over, or recovered.

Plaintiff's Complaint, Exhibit D. ATB filed for bankruptcy on August 12, 1988, with approximately $400,000 in accounts receivable and approximately $382,000 outstanding to truckers hauling loads brokered by ATB. *See* L. Atkinson Aff. ¶ 9; J. Atkinson Aff. ¶ 9.[5]

### B. Delta Pride and ATB

Delta Pride owns and operates approximately fifty trucks which deliver processed catfish to wholesale brokers throughout the United States. Before 1982 Delta Pride drivers would deliver their catfish product and return with unloaded trucks to their Mississippi plant. In an effort to decrease "deadhead" miles, Delta Pride instructed its drivers to contact truck brokers to arrange, if possible, delivery of a load along a similar return route. Since that time, Delta Pride has used over 100 truck brokers.

Delta Pride began using ATB in 1985 or 1986 after Delta Pride's Traffic Manager, Dewayne Williamson, learned that ATB brokered for Lewis Grocery and regularly scheduled loads from the California coast to Indianola, Mississippi. According to Mr. Williamson's deposition testimony, after Delta Pride would deliver a load for ATB, it would mail the bill of lading to ATB and usually received a check from ATB in approximately seven to ten days. However, in early 1988, Delta Pride began experiencing some slowness in receiving payment from ATB. Because Delta Pride was growing rapidly, it took additional time to deliver the invoices to ATB and therefore did not worry if it took thirty to forty days to get paid.

---

**5.** The bankruptcy action, styled *In re Atkinson & Co. Truck Brokers, Inc.*, No. PB 88–310S, is still pending in the United States Bankruptcy Court for the Eastern District of Arkansas.

When some payments fell behind sixty to ninety days, Mr. Williamson testified that he "called Mr. Atkinson several times, and they would send a payment or say a payment was coming." Williamson Dep. at 28. Mr. Williamson also contacted Cam Harrington at Lewis Grocery, which used ATB as a broker, and asked whether Delta Pride should continue hauling for ATB. At that time, according to Mr. Williamson, ATB owed Delta Pride around $50,000. Mr. Harrington informed Mr. Williamson that Lewis Grocery owed ATB approximately $60,000 to $90,000 and attempted to set Mr. Williamson's mind at ease by saying: "I know Mr. Atkinson very well. He is a fine man. I'll assure you that you will be paid. I will put some pressure on him to see that he pays you." *Id.* at 29. With this assurance, and the receipt of a ten or twelve thousand dollar payment from ATB, Delta Pride continued hauling shipments for ATB. *Id.*

Marine Midland contacted Delta Pride by letter dated April 8, 1988 to inquire as to the payment history of ATB. Delta Pride responded that the payment history was good and no amounts were past due, but that ATB currently owed $22,100 to Delta Pride. *See* Defendant Marine Midland's Motion to Dismiss or, Alternatively, Motion for Summary Judgment, Exhibit 9 [hereinafter Defendant's Exhibit 9]. Besides this instance, no other communications occurred between employees of Delta Pride and Marine Midland.

When Delta Pride learned that ATB had ceased operations and that Larry Atkinson had been employed by Terminal Truck Brokerage, Delta Pride considered holding a load of freight "which was worth more than what he owed, at the dock and not unloading it until we got our money." Williamson Dep. at 44. But, with renewed assurances from Mr. Atkinson and Mr. Harrington, Delta Pride delivered the load. *Id.* at 44–45.

Delta Pride filed a proof of claim in ATB's bankruptcy in the amount of $31,-526.36. Thereafter, upon Delta Pride's motion, the bankruptcy court entered an order on September 29, 1989, granting relief from the automatic stay to allow this litigation against the debtor's estate, the trustee in bankruptcy, and Marine Midland.

## II. DISCUSSION

### A. Standard for Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment "correctly results from the application of substantive law to facts established beyond reasonable controversy," *Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir.1990), but should not be granted if a fair-minded jury could return a verdict for the nonmoving party on the evidence presented, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A moving party is entitled to summary judgment, after adequate time for discovery and upon motion, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Lujan v. National Wildlife Federation*, —— U.S. ——, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). In such instances, there is no genuine issue of material fact, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. The moving party is not required to produce evidence showing the absence of a genuine issue of material fact; rather, the moving party's burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. *See Lujan*, 110 S.Ct. at 3187

(movant not required to negate elements of nonmovant's case).

In deciding whether to grant summary judgment, the court must view the facts in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Woodsmith Publishing*, 904 F.2d at 1247. Nevertheless, a party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials" of its pleadings, but must go beyond the pleadings and by affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be "outcome determinative" under applicable law. *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir.1989); *Twin City Bank v. Verex Assurance, Inc.*, 733 F.Supp. 67, 67–68 (E.D.Ark.1990).

### B. Plaintiff's Breach of Trust Claim

■ Delta Pride's action essentially is premised on the assumption that the proceeds received from the shippers, less commissions and advances, belonged not to ATB or Marine Midland, but to the truckers who hauled the shipments. The validity of this assumption turns upon the nature of the legal relationship between Delta Pride, ATB, and Marine Midland.

Delta Pride argues that ATB collected the proceeds of its accounts receivable as an agent of Delta Pride and other truckers.

Because of this agency relationship, according to Delta Pride, ATB had a fiduciary duty to hold the collected funds in trust for Delta Pride. Therefore, when ATB turned over its collections to Marine Midland, Marine Midland became an actual or constructive trustee of the monies. In failing to remit the trust funds, Marine Midland allegedly breached its fiduciary duty to Delta Pride.

This argument fails for three reasons. First, there was no agency relationship between Delta Pride and ATB, and therefore no constructive trust over the funds collected from the shippers.[6] Second, assuming that these funds were subject to trust, there is no evidence that ATB actually collected and remitted to Marine Midland the payments to which Delta Pride was entitled. Third, assuming ATB did collect and remit to Marine Midland funds held in trust for Delta Pride, such trust is subordinate to Marine Midland's perfected security interest.

Delta Pride seizes upon various references to ATB as a "broker" as indicia of an agency or fiduciary relationship between Delta Pride and ATB. Its legal argument supporting its claim that ATB acted as agent for the haulers amounts to little more than quoting definitions of "broker" from American Jurisprudence 2d and Corpus Juris Secundum and pointing out references in Marine Midland's business records to ATB as a "broker" or "intermediary." *See* Plaintiff's Brief in Response to Defendant's Motion to Dismiss, or, Alternatively, for Summary Judgment at 3–4, 6–7 [hereinafter Plaintiff's Response Brief]. Such generalized definitions and oblique refer-

---

**6.** In *Horton v. Koner*, 12 Ark.App. 38, 671 S.W.2d 235 (1984), the Arkansas Court of Appeals described the application of the constructive trust doctrine:

> Constructive trusts are said to arise and be imposed in favor of persons entitled to a beneficial interest against one who secures legal title either by an intentional false oral promise to hold title for a specified purpose, and having thus obtained title, claims the property as his or her own, or one who violates a confidential or fiduciary duty or is guilty of any other unconscionable conduct which amounts to constructive fraud.

*Id.* at 43, 671 S.W.2d at 238. *Accord In re Bass Mechanical Contractors, Inc.*, 84 B.R. 1009 (Bankr.W.D.Ark.1988). Delta Pride offers the purported agency relationship between the haulers and ATB as the sole basis for imposing a constructive trust on the proceeds of ATB's accounts receivable. There are no allegations under this theory that ATB made an intentional false oral promise to hold title to the proceeds for a specified purpose, that a confidential relationship existed between the parties, or that ATB's conduct was so unconscionable as to constitute constructive fraud.

ences do not contemplate the particular facts presented in this case, and therefore are of little help in determining whether an agency relationship existed between Delta Pride and ATB.

■ Nor can Delta Pride rely on the assertions of Stephen Glover, controller for ATB, who states in paragraph six of his affidavit that "[the] commission amount was the only portion of the hauler's invoice to which ATB had a claim" and "[t]he remainder of the invoiced amount was solely the property of the hauler, except for advances." Such remarks amount to legal conclusions rather than evidence of agency relations; conclusory allegations will not suffice to establish genuine issues of material fact sufficient to defeat a motion for summary judgment. *See McVay v. Western Plains Service Corp.*, 823 F.2d 1395, 1398 (10th Cir.1987). Where the interests or rights of third parties are involved, the relationship between contracting parties must be determined by its real character rather than by the form and color that the parties have given it. *In re Shulman Transport Enterprises, Inc.*, 744 F.2d 293, 295 (2d Cir.1984). A debtor does not become the agent of his creditor simply because he is called an agent. *Standard Fashion Co. v. Mangrane–Houston Co.*, 258 U.S. 346, 354, 42 S.Ct. 360, 361, 66 L.Ed. 653 (1922).

Arkansas courts define an agency relationship as "the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control and that the other consents to so act." *Schuster's Inc. v. Whitehead*, 291 Ark. 180, 181–82, 722 S.W.2d 862, 863 (1987). "The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on the principal's behalf and subject to his control. The two essential elements of the definition are authorization and right to control." *Evans v. White*, 284 Ark. 376, 378, 682 S.W.2d 733, 734 (1985) (citation omitted). The undisputed facts in this case clearly demonstrate that the term "broker," as used in the trucking industry to denote the relationship between ATB and

truckers, does not establish a true "broker" or "agency" relations between the parties under Arkansas law. Absent the critical elements of authorization and control by Delta Pride over ATB's collection and handling of funds, ATB cannot be said to have acted as Delta Pride's agent for the receipt of the transportation charges. *See In re Shulman*, 744 F.2d at 295.

There was no written contract between Delta Pride and ATB purporting to create an agency relationship. Instead, Delta Pride claims that its relationship with ATB was established orally in accordance with the custom of the business. Plaintiff's Response to Defendants' Statement of Undisputed Facts ¶ 19. Yet, with respect to the collection of accounts receivable by ATB, there is no evidence of industry custom showing that Delta Pride authorized ATB to act as its agent, and that ATB acted or agreed to act on Delta Pride's behalf and subject to its control.

Delta Pride has offered no proof that industry custom required ATB to segregate from its general funds monies collected for the truckers' services or restricted ATB's use of those monies. After a trucker presented the bill of lading to ATB and received payment, the collection of ATB's accounts receivable was completely within the control of ATB. ATB could commingle, pledge, or otherwise use the proceeds of its accounts receivable. At no time during the relationship between Delta Pride and ATB did Delta Pride control or attempt to control the method of collection of ATB's accounts receivable or restrict the use of the proceeds after receipt by ATB. Although the absence of a segregation provision and even the actual commingling of funds (as here) are not conclusive indications of a debtor-creditor relation between the parties, the apparent lack of concern by the truckers in how ATB handled its collections indicates that, in this respect at least, ATB was not subject to the truckers' direction and control. *In re Shulman*, 744 F.2d at 295.

Most significantly, it is undisputed that in the normal course of business, rather than merely transmitting monies actually

received, ATB used its general funds to make cash advances to truckers for expenses and to pay truckers the net due for their services *before* receiving payment from the shippers for those services. Truckers benefitted by getting their money up front, rather than waiting until the amount due on a particular invoice or account was paid. ATB could accommodate the truckers in this manner because it borrowed operating funds from Marine Midland. ATB apparently had no recourse against truckers it paid in advance if the shippers owing on those invoices were delinquent or failed to pay. Thus both the risk of collection and the risk of default fell upon ATB rather than the truckers. Moreover, if ATB paid the trucker before collecting from the shipper, it is quite obvious that the money thereafter collected cannot be the property of the trucker.

Although less probative, defendant's Exhibit 9 provides further indication that the parties understood the relation between Delta Pride and ATB as that of debtor and creditor. Exhibit 9 is a copy of form letter dated April 8, 1988 sent by Marine Midland to Delta Pride requesting information about Delta Pride's "account" with ATB, including the date the account was opened, any amount past due, the highest recent *credit* extended by Delta Pride to ATB, any amount currently due, a brief analysis of ATB's payment record, and terms.

If Arkansas law requires clear, cogent, and convincing evidence of a fiduciary or confidential relationship to impose a constructive trust on the basis of an oral agreement, *see, e.g., Bramlett v. Selman,* 268 Ark. 457, 597 S.W.2d 80 (1980), *Bottenfield v. Wood,* 264 Ark. 505, 573 S.W.2d 307 (1978), *Beeson v. Beeson,* 11 Ark.App. 79, 667 S.W.2d 368 (1984), then at least the same degree of proof is necessary for Court to impose a constructive trust based upon a fiduciary relationship created by industry custom. Yet Delta Pride has failed to offer any evidence sufficient to raise a question of fact as to whether ATB was its agent for the collection of shipping charges.

Two district courts faced with similar cases involving purported agency relations based on express contracts have reached the same conclusion. The case of *In re Shulman Transport Enterprises, Inc.,* 744 F.2d 293 (2d Cir.1984), involved an attempt by an air carrier to recover from a freight forwarder and its lender the proceeds received by the freight forwarder from the sale of air cargo freight services. Relations between the airline and the freight forwarder were governed by a trade agreement which expressly provided that all monies collected by the freight forwarder for the transportation it sold became the property of the transporting carrier. The airline argued that the monies received from the sale of air cargo services therefore could not be included in the security interest in accounts receivable that the freight forwarder conveyed to its lender. Despite the express terms of the agreement, the court held that no agency or fiduciary relationship existed between the airline and the freight forwarder and rejected the airline's argument that the freight forwarder held the shipping proceeds in trust. In reaching this conclusion, the court noted that the agreement did not require segregation or otherwise restrict the use of those proceeds and held the freight forwarder responsible for the payment of monies due the carrier whether or not the money had been collected from the shipper.

In *Allied Van Lines, Inc. v. Small Business Admin.,* 507 F.Supp. 397 (E.D.Mo. 1980), *aff'd,* 667 F.2d 751 (8th Cir.1982), a van line (Allied) attempted to recover from the Small Business Administration (SBA) proceeds from accounts receivable of a trucking company (Biltmoor) which had entered into an agency contract with Allied. The agency agreement provided that Biltmoor would book, register, pack, crate, prepare for transportation, receive, load, transfer, unload, store, warehouse, and deliver shipments of household goods for and in behalf of the van line. The contract further provided that Biltmoor would send invoices for services it rendered to Allied for collection. Biltmoor later obtained a chattel mortgage from a bank to finance its operations. The loan was secured by

Biltmoor's equipment, inventory, and accounts receivable. Almost two years after the security interest was perfected, Allied and Biltmoor modified their agency relation to require Biltmoor to hold in trust for Allied any collections of charges on behalf of Allied until Biltmoor could remit those monies to Allied. When Biltmoor ceased doing business, its assignee for the benefit of creditors collected the accounts receivable and paid the proceeds to the SBA, the successor to the bank's interest in the loan.

The court found that Allied and the SBA were rival creditors of Biltmoor and rejected Allied's argument that the proceeds were subject to either an express or constructive trust which took precedence over the SBA's secured claim. The court further concluded that "on the date of Biltmoor's assignment Allied became an unpreferred, unsecured contract creditor of Biltmoor," since "Allied never sought to secure Biltmoor's agency obligations to it, and in failing to do so never perfected its interests against encroachment by third parties." *Id.* at 400. The Eighth Circuit, affirming, noted that "[i]mplicit in that finding is a finding that while Allied may have some interest in the accounts receivable, Allied does not in fact 'own' those accounts." *Allied Van Lines, Inc. v. Small Business Admin.*, 667 F.2d 751, 753 (8th Cir.1982).

Courts presented with similar arrangements in other transportation industries also have held that funds collected by one business for transportation rendered by another lack trust status. *See, e.g., In re Iowa R.R. Co.*, 840 F.2d 535, 541–42 (7th Cir.1988) (interline railroad freight balances are general unsecured debts rather than trust funds); *In re Morales Travel Agency*, 667 F.2d 1069 (1st Cir.1981) (claims of airlines are unsecured debts of travel agencies); *In re Braniff Airways, Inc.*, No. 482–00369 (Bankr.N.D.Tex. Feb. 1, 1983) (monies collected by one airline for transportation provided by another are treated as unsecured debts). *Cf. Carlson, Inc. v. Commercial Discount Corp.*, 382 F.2d 903 (10th Cir.1967) (proceeds from cash sales in leased store departments remitted daily to lessor were not held in trust); *Chicago*

*Cutter–Karcher, Inc. v. Maley (In re Lord's, Inc.)*, 356 F.2d 456 (7th Cir.1965), *cert. denied*, 385 U.S. 847, 87 S.Ct. 55, 17 L.Ed.2d 78 (1966) (funds resulting from sale of lessee's shoes and accessories by lessee's employees in department store of bankrupt were not held by department store in trust for lessee); *In re Penn Central Transportation Co.*, 351 F.Supp. 1346 (E.D.Pa.1972) (consigner who rejected damaged goods in favor of value of shipment was not entitled to proceeds from subsequent salvage sale by railroad carrier absent showing that railroad carrier was acting as agent or in fiduciary capacity and where proceeds were commingled with railroad funds); *In re Bass Mechanical Contractors, Inc.*, 84 B.R. 1009 (Bankr.W.D. Ark.1988) (payment to contractor or subcontractor does not create trust or place any title to payments in suppliers whom may be entitled to liens on project). The Court believes these cases were decided correctly.

■ Assuming the proceeds from ATB's accounts receivable were subject to a constructive trust, there is no evidence that ATB actually collected and remitted to Marine Midland the payments to which Delta Pride claims it is entitled. The plaintiff correctly states Arkansas law that commingling of funds of several beneficiaries does not destroy the trust character of the funds; it is sufficient if there are accurate records of the monies collected. *Murry v. Hale*, 203 F.Supp. 583, 592–93 (E.D.Ark. 1962). However, trust funds transferred to a third party still must be traceable. *In re Van Meter*, 135 F.Supp. 781, 785–86 (D.C.Ark.1956). In the present case, Delta Pride has submitted a copy of the proof of claim form and supporting invoices it filed in bankruptcy court against ATB for $31,-526.36. *See* Plaintiff's Exhibit 14. The invoices are for various loads Delta Pride claims it hauled but it never received payment for from ATB. However, Delta Pride has failed to offer evidence, or even to allege, that any of the shippers actually *paid* ATB the shipping charges for these loads. ATB cannot hold in constructive trust monies it did not receive, and Delta

Pride has not come forth with any proof showing that ATB was paid any or all of the $31,500 in the first place.

■ Even if ATB did collect and remit to Marine Midland funds held in constructive trust for Delta Pride, such trust is subordinate to Marine Midland's security interest. Marine Midland properly perfected its security interest in ATB's after-acquired accounts receivable by the filing of financing statements prior to the circumstances giving rise to the alleged breach of trust. Therefore, when an account receivable payable to ATB was created, the receivable, although subject to a constructive trust in favor of Delta Pride, also became subject to Marine Midland's security interest in after-acquired accounts receivable. Since Marine Midland is a bona fide purchaser for value of a lien in ATB's accounts receivable, Marine Midland's interest defeats any equitable interest that Delta Pride holds as a beneficiary of a constructive trust. *See Tradax America, Inc. v. First National Bank in Stuttgart, Arkansas (In re Howell Enterprises, Inc.),* 105 B.R. 494, 497–99 (Bankr.E.D.Ark.1989) (bank which held security interest in debtor's accounts receivable qualified as good faith purchaser for value with rights in receivables superior to beneficiary of constructive trust).

This is not a case of robbing Peter to pay Paul. Evidence of ATB's normal operations and previous business dealings with Delta Pride establish as a matter of law that no agency or fiduciary relation existed between Delta Pride and ATB. Accordingly, the Court finds that Delta Pride and Marine Midland simply were rival creditors of ATB, and the Court knows of no duties inherent in the common desire of rival creditors to obtain payment. *Allied Van Lines,* 507 F.Supp. at 400. Absent some fiduciary duty arising from the nature of their relation, Marine Midland, as a matter of law, could not have breached any trust owing to Delta Pride. The Court therefore grants summary judgment in favor of Marine Midland on this claim.

### C. Plaintiff's Conversion Claim

■ Delta Pride alleges that by diverting the proceeds of the accounts receivable to Marine Midland instead of paying the truckers, both ATB and Marine Midland converted funds belonging to Delta Pride. This claim likewise must fail.

Under Arkansas law "[t]he act of conversion is 'the exercise of dominion over property in violation of the rights of the owner or person entitled to possession.'" *Big A Warehouse Distrib. v. Rye Auto Supply,* 19 Ark.App. 286, 290, 719 S.W.2d 716, 718 (1986) (quoting *Quality Motors v. Hays,* 216 Ark. 264, 268, 225 S.W.2d 326, 328 (1949)). The elements of conversion are (1) ownership of property by the plaintiff and (2) the exercise of dominion over the property by the defendant in violation of the plaintiff's rights. *Giroir v. MBank Dallas, N.A.,* 676 F.Supp. 915, 919 (E.D.Ark. 1987).

Delta Pride cannot establish ownership rights in the proceeds from ATB's accounts receivable. As explained above, while Delta Pride may have some interest in the accounts receivable as a creditor of ATB, it does not in fact "own" those accounts. *See Allied Van Lines,* 667 F.2d at 753. Obviously, if ATB paid the trucker before collecting from the shipper, the money thereafter collected cannot be the property of the trucker. Nor is there proof that the actual monies over which Delta Pride claims ownership were collected by ATB.

Marine Midland did not exert any dominion over these funds inconsistent with the rights of the plaintiff. Marine Midland had a perfected security interest in ATB's accounts receivable and proceeds thereof; as a secured creditor, Marine Midland was entitled to the funds forwarded by ATB. Thus, as a matter of law, Marine Midland acted within its rights as a secured creditor and did not exert a right over property owned by Delta Pride. The Court therefore grants summary judgment to Marine Midland on the plaintiff's claim of conversion.

### D. Plaintiff's Fraud Claim

■ To prevail on a common law fraud claim in Arkansas, the plaintiff must prove (1) a false representation of a material fact,

(2) knowledge or belief on the part of the person making the representation that the representation is false or that there is not a sufficient basis of information to make such a representation, (3) an intent to induce the other party to act or refrain from acting in reliance upon the misrepresentation, (4) a justifiable reliance upon the representation by the other party in taking action thereon, and (5) resulting damages. *Bishop v. Tice,* 622 F.2d 349, 358 (8th Cir. 1980); *Brookside Village Mobile Homes v. Meyers,* 301 Ark. 139, 141–42, 782 S.W.2d 365, 367 (1990). Delta Pride concedes that Marine Midland "did not directly talk to the haulers." Plaintiff's Response Brief at 35. The only statements Delta Pride claims to have relied upon to its detriment are those allegedly made by Larry Atkinson of ATB and Cam Harrington of Lewis Grocery. Since Delta Pride fails to present any evidence, or even to plead, that Marine Midland made a false representation to Delta Pride, summary judgment in favor of the Marine Midland is appropriate on this claim.

### E. Plaintiff's RICO Claim

#### 1. Introduction to RICO

■ Although the primary target of Congress in enacting the RICO was to curb the infiltration of legitimate business organizations by organized crime, *Russello v. United States,* 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983), RICO also imposes civil liability for racketeering activities in other contexts. *Atlas Pile Driving Co. v. DiCon Financial Co.,* 886 F.2d 986, 990 (8th Cir.1989). *See H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 2903–05, 106 L.Ed.2d 195 (1989) (no organized crime nexus required for RICO claims). Civil RICO provides for drastic remedies: any person or business injured by a violation of RICO is entitled to treble damages, as well as costs and attorney's fees. 18 U.S.C. § 1964(c).

In the present case, Delta Pride alleges that Marine Midland violated 18 U.S.C. § 1962(c), which makes it "unlawful for any person ... associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to ... participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." A "pattern of racketeering activity" is defined as "at least two acts of racketeering activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years." *Id.* § 1961(5). "Racketeering activity" means any "act or threat involving" specified state-law crimes, any "act" indictable under various specified federal statutes, and certain federal "offenses." *Id.* § 1961(1). An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Id.* § 1961(4). A "person" is "any individual or entity capable of holding a legal or beneficial interest in property." *Id.* § 1961(3).

Marine Midland argues that Delta Pride cannot establish the elements necessary to prove fraudulent conduct constituting "racketeering activity," nor can it show that Marine Midland engaged in a "pattern" of racketeering activity or "participated" in the activities of a RICO enterprise as these terms are construed in 18 U.S.C. § 1961 *et seq.* The Court will address each of these issues in turn.

#### 2. Racketeering Activity

As indicated above, to prevail under RICO a plaintiff must demonstrate that a defendant committed acts of racketeering activity, also known as predicate offenses. Here, Delta Pride alleges that Marine Midland engaged in both mail fraud, 18 U.S.C. § 1341,[7] and wire fraud, 18 U.S.C. § 1343,[8]

---

7. Section 1341 provides:
   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representation, or promises, ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized

depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, ... shall be fined ... or imprisoned....

8. Section 1343 provides:
   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for

which are two of the predicate offenses listed in section 1961(1)(B). Specifically, Delta Pride asserts that Marine Midland used the mails and wire, including the telephone, to further a secret scheme to siphon off monies ATB collected on behalf of the truckers which ATB was obligated to remit to the truckers, including Delta Pride. This scheme allegedly involved an agreement between Marine Midland and Larry Atkinson to use ATB to solicit business from the truckers without intending to pay those truckers for the services provided in transporting the shipments. Instead, Marine Midland and Larry Atkinson allegedly planned to use and did use the monies to pay ATB's debt to Marine Midland, thereby benefitting both Marine Midland and Larry Atkinson. Delta Pride claims that it relied on the representations of ATB that it would continue to collect and remit these funds, but that Marine Midland and Larry Atkinson did not tell Delta Pride, and prevented ATB from telling Delta Pride, that ATB would no longer honor its obligation to pay Delta Pride for the shipments hauled.

■ Marine Midland, citing *Horn v. Ray E. Friedman & Co.*, 776 F.2d 777 (8th Cir.1985), argues that to show the existence of a scheme to defraud, the plaintiff must prove that the defendant committed a fraudulent act, which, according to Marine Midland, requires proof of a false representation of material fact, knowledge or belief of its falsity, and an intent to induce reliance on the representation. Since it is undisputed that no one from Marine Midland talked to anyone at Delta Pride, Marine Midland asserts that there is no evidence of any representations (false or otherwise) to the plaintiff, nor of any intent to induce reliance on the part of the plaintiff; therefore, summary judgment is appropriate.

■ Marine Midland misreads *Horn*. The Eighth Circuit did not hold that where a defendant participates in a scheme to

obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... communication

defraud it cannot be held liable under RICO unless it made a false representation to the plaintiff. On the contrary, no misrepresentation of fact is required in order to prove mail or wire fraud. *See Atlas Pile Driving*, 886 F.2d at 991; *United States v. McNeive*, 536 F.2d 1245, 1249 n. 10 (8th Cir.1976). The crime of mail fraud is broad in scope and the fraudulent aspect of a scheme to defraud is measured by a nontechnical standard, condemning conduct that fails to conform to societal standards of moral uprightness, fundamental honesty, fair play, and right dealing. *United States v. Bishop*, 825 F.2d 1278, 1280 (8th Cir.1987) (citing *McNeive*, 536 F.2d at 1247–50, and *United States v. States*, 488 F.2d 761, 764 (8th Cir.1973)). To sustain a charge of mail fraud under section 1341, the plaintiff must show the existence of a plan or scheme to defraud, that it was foreseeable that the defendant's scheme would cause the mails to be used, and that the use of the mails was for the purpose of carrying out the fraudulent scheme. *Atlas Pile Driving*, 886 F.2d at 991; *United States v. Leyden*, 842 F.2d 1026, 1028 (8th Cir.1988). Likewise, the essential elements of wire fraud under section 1343 are the existence of a scheme to defraud and the use of wires for the purpose of executing the scheme. *United States v. Andrade*, 788 F.2d 521, 527 (8th Cir.1986) (elements of wire fraud are identical to mail fraud except for use of wires rather than mail).

The first inquiry, therefore, is whether there was a scheme to defraud. "[T]he term 'scheme to defraud' connotes some degree of planning by the perpetrator, [and] it is essential that the evidence show the defendant entertained an intent to defraud." *Atlas Pile Driving*, 886 F.2d at 991 (quoting *McNeive*, 536 F.2d at 1247 (citation omitted)). Intent to defraud may be inferred from the facts and circumstances surrounding the transactions. *Andrade*, 788 F.2d at 527.

in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined ... or imprisoned....

Here, no evidence indicates that Marine Midland engaged in a scheme to defraud the truckers, including Delta Pride. First, the "scheme" Delta Pride depicts as "stealing" and "theft" is a common business practice known as accounts receivable financing. The agreement between ATB and Marine Midland required ATB to assign all accounts receivable to Marine Midland on a daily basis. Based on the collateral value of the assigned accounts and on the amount of any proceeds received thereof, Marine Midland would then, upon request, loan ATB monies which ATB would use for advances and payments to truckers. Such an arrangement is not *per se* fraudulent. The existence of the alleged scheme to defraud must presuppose that Marine Midland had no prior legal right to or interest in the proceeds of ATB's accounts receivable. As a secured creditor of ATB, Marine Midland was under no legal duty to remit the proceeds of the receivables to unsecured creditors of ATB, including Delta Pride and other truckers. Marine Midland rightfully could collect the proceeds from the accounts receivable, as it had done from the inception of its financing arrangement with ATB, in satisfaction of ATB's loan obligation. Delta Pride overlooks the fact that by the very nature of accounts receivable financing, it and other truckers were paid with monies loaned to ATB by Marine Midland.

Second, while ATB claims that Marine Midland either aided and abetted or directly colluded with ATB to solicit truckers to carry loads without any intention of paying the truckers for their services, the Court, upon careful review of the numerous exhibits and affidavits submitted by the parties, can find no evidence of such a scheme to defraud. Rather, these records reveal that Marine Midland took various steps within the law to protect and recover the substantial balance due on its loan to ATB, while at the same time attempting to give ATB additional time to secure alternative financing. In fact, it was not until after ATB ceased operations that Marine Midland demanded that ATB immediately pay off its loan.

If any scheme to defraud the truckers existed, Delta Pride has offered no evidence suggesting that Marine Midland either aided and abetted or colluded with ATB or Larry Atkinson in such a scheme. Moreover, contrary to Delta Pride's claim that ATB and Marine Midland had no intention of paying the truckers, Dewayne Williamson's testimony indicates that Delta Pride *received* periodic payments from ATB until ATB ceased operations in late April 1988. Mr. Williamson, Delta Pride's Traffic Manager, testified that when some of ATB's payments fell behind sixty to ninety days, "I called Mr. Atkinson several times, and *they would send a payment* or say a payment was coming." Williamson Dep. at 28 (emphasis added). He added:

> Somewhere around there, *we got a little bit of money, I think 10 or 12 thousand dollars,* that kind of appeased us ... [a]nd we went along for two or three months that [sic] [Mr. Atkinson] would *pay the oldest bill*—the oldest load, he would *send us a check* for it, and then we woke up one day and he wasn't anymore.

*Id.* at 29 (emphasis added).

Delta Pride makes much of the fact that Marine Midland knew that ATB was not paying the truckers on a current basis. *See* Plaintiff's Response Brief at 7–9. While this fact has little significance absent a fiduciary relation between the parties, the Court does note that Delta Pride itself represented to Marine Midland sometime after April 8, 1988—less than a month before ATB ceased operations—that ATB's payment record was "good" and that no monies were past due. Defendant's Exhibit 9. Delta Pride also related that while ATB's highest recent credit was $50,000, ATB was currently owing only $22,100, and it offered no additional "remarks" concerning ATB's account. *Id.*

The Court finds that Delta Pride's allegations that Marine Midland was involved in a scheme to defraud are merely conclusory. Delta Pride has failed to present any evidence of such a scheme, nor could its existence be reasonably inferred from the surrounding facts and circumstances.

### 3. Pattern of Racketeering Activity

Section 1961(5) defines the RICO pattern requirement as "at least two acts of racketeering activity" within a ten-year period. Merely alleging two predicate acts, however, does not satisfy the pattern requirement. *Sedima S.P.R.L. v. Imrex, Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). Instead, the plaintiff must prove that the predicate acts amount to or otherwise constitute a threat of continued criminal activity (the continuity element), and that the predicate acts are related (the relationship element). *Id.* "It is this factor of *continuity plus relationship* which combines to produce a pattern." *Id.* (emphasis added).[9]

In *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court confirmed the "continuity plus relationship" test of *Sedima*. "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Northwestern Bell*, 109 S.Ct. at 2900 (emphasis in original). For guidance in defining the relatedness element, the Court looked to a later provision in the same bill which included RICO: "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 2901 (quoting 18 U.S.C. § 3575(e)).

Turning to the continuity element, the Court considered and rejected the Eighth Circuit's rule that the defendants engage in multiple schemes to satisfy the pattern requirement. *See generally H.J., Inc. v. Northwestern Bell Tel. Co.*, 829 F.2d 648

(8th Cir.1987), *rev'd*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Superior Oil Co. v. Fulmer*, 785 F.2d 252 (8th Cir. 1986).[10] "[I]t is implausible to suppose that Congress thought [a pattern] may be shown *only* by proof of multiple schemes." *Northwestern Bell*, 109 S.Ct. at 2901 (emphasis in original). Instead, the Court declined to formulate a general test, adopting a "less inflexible approach." *Id.*

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept.... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*Id.* at 2902 (citations omitted) (emphasis in original). With these principles in mind, the Court concludes, after closely examining the pleadings and exhibits, that Delta Pride cannot establish continuity as a matter of law.

The plaintiff's complaint alleges that sometime after November 1, 1988, Marine Midland and Larry Atkinson entered into an "agreement or arrangement by which ATB would continue to broker shipments for haulers but use the collection of the haulers' new invoices to pay Marine Midland's old debt due it from ATB." Complaint at ¶¶ 20 and 21. The complaint fur-

---

**9.** Delta Pride admonishes the Court to "abandon its bias against the RICO Act and quit trying to subvert it by using stilted definitions of words such as 'pattern' to hobble the sweep of the statute." Plaintiff's Response Brief at 26–27. The Court is baffled by the plaintiff's vituperation, especially since this opinion is the Court's first occasion to rule on a RICO claim.

**10.** Marine Midland apparently overlooked the Supreme Court's decision in *Northwestern Bell* in its initial brief in support of its motion to dismiss or for summary judgment, instead arguing the multiple scheme requirement established in *Superior Oil*.

ther states that Marine Midland and Larry Atkinson committed mail fraud between "on or about January 2, 1988, and April 29, 1988," *id.* at ¶ 44, and that the defendants committed wire fraud by telephone conversations between November 1987 and June 30, 1988, *id.* at ¶ 47, but only identifies with particularity alleged acts of wire fraud by telephone occurring in March and April 1988, *id.* at 46.

The plaintiff's RICO Case Statement, filed subsequent to its complaint at the direction of the Court, similarly alleges that sometime after November 19, 1987, Larry Atkinson and Marine Midland entered into the agreement to defraud the truckers. RICO Statement at ¶ 2(a)(18), (19), (22), and (23). However, the plaintiff broadens the alleged predicates to include acts of mail and wire fraud between January 9, 1986 and June 9, 1988. *Id.* at ¶ 5(a). The alleged acts of mail fraud include sending invoices to and receiving payments from shippers during this entire period, as well as a letter mailed from Marine Midland to ATB dated December 30, 1986, amending their contract. *Id.* at ¶ 5(a)(1). The remaining acts of mail fraud allegedly occurred between December 2, 1987 and May 11, 1988. *Id.* Likewise, alleged acts of wire fraud during the entire period include Marine Midland's routine use of the wire to notify the depository bank into which it deposited funds collected by ATB to transfer funds to ATB's bank and ATB's regular use of the telephone to communicate with shippers and truckers concerning the various loads carried by the truckers. *Id.* at ¶ 5(a)(2). The only particular acts identified are phone conversations in September 1987 between Marine Midland and ATB concerning ATB's financial affairs, and phone conversations in March and April 1988 between ATB and Delta Pride arranging shipments. *Id.*

As a threshold matter, unless the accounts receivable financing arrangement was fraudulent from its inception (a notion this Court has already rejected), any acts occurring prior to the alleged agreement in late 1987 would not be a part of the requisite fraudulent scheme, and therefore fail to meet the relatedness requirement for establishing a pattern under RICO.

Assuming for the purposes of this analysis only that the plaintiff's allegations are true, and resolving the inconsistencies in the complaint and RICO statement in the plaintiff's favor, the Court finds that the particular predicate acts alleged to constitute mail or wire fraud transpired over a period lasting a little more than five months from December 2, 1987 to May 11, 1988. Since the purpose of the scheme was to pay off ATB's loan to Marine Midland, the Court also concludes that the scheme was closed-ended and there was no threat of continued criminal activity. The scheme was a single, short-lived attempt to achieve a single purpose in a finite period of time; when the loan was paid off, the scheme had a natural ending. There is, therefore, no "specific threat of repetition," nor has Delta Pride adduced any evidence that the predicate acts are "a regular way of conducting [Marine Midland's] ongoing legitimate business." *Northwestern Bell*, 109 S.Ct. at 2902. Consequently, in view of the Supreme Court's statement in *Northwestern Bell* that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement," *id.*, the Court finds no pattern of racketeering activity. *See Olive Can Co., Inc. v. Martin*, 906 F.2d 1147 (7th Cir.1990) (affirming summary judgment for failure to show pattern of racketeering activity in allegedly fraudulent scheme to repay loan over six month period).

Since the Court finds that Delta Pride cannot establish the elements necessary to prove fraudulent conduct constituting "racketeering activity," nor can it show that Marine Midland engaged in a "pattern" of racketeering activity, the Court does not need to reach the question of whether Marine Midland "participated" in the activities of a RICO enterprise. Summary judgment is granted in favor of Marine Midland on the plaintiff's RICO claim.